Lois E. FRITZ, appellee, v. ELLWYN DEAN FRITZ, appellant.

No. 52332.

(Reported in 148 N.W.2d 392)

410

FEBRUARY 7, 1967.

REHEARING DENIED APRIL 3, 1967.

Gordon K. Darling, of Winterset, for appellant.

Webster, Frederick & Jordan, of Winterset, for appellee.

LARSON, J.—This is a divorce action, brought by the plaintiff-wife on the ground of cruel and inhuman treatment. Defendant's

cross-petition asked that a divorce be granted to him on the grounds of adultery and cruel and inhuman treatment. It involved a third party, William Spencer, a friend taken into the home of the parties as a convenience and benefit to him. The trial court granted plaintiff's petition, dismissed defendant's cross-petition, awarded the parties' three minor children and a yet-unborn child to plaintiff, and granted her alimony, support money and attorney fees. Defendant has appealed.

Plaintiff, age 28, and defendant, age 32, had been married over ten years, had resided in Madison County, Iowa, the past nine years, and were engaged in farming as renters at the time this action was filed. They had three children, ages 9, 7 and 6 at the time of the trial, and plaintiff was expecting to bear another child sometime in March 1966. Defendant was experienced in mechanical work and farming and at the time of their separation the parties had purchased a 222-acre farm nearby. Defendant was a hard worker, farming about 600 acres of land himself besides helping others, and remodeling the farmhouse in which they were to move in 1966.

Until 1963 the parties seemed to be content and happy in their endeavors and relationship. At that time an incident occurred which disturbed plaintiff, although it seemed insignificant to her later. While they were attending a friend's wedding in Illinois, plaintiff thought defendant danced too long and paid too much attention to the wife of another. Whether this triggered plaintiff's conduct with other men later we cannot say, but it fairly appears she was more or less flirtatious and liked men associates. Defendant did not have a suspicious nature and seemed to allow for this conduct and considered it harmless. Although he disliked his wife's taste for liquor and beer, he did not believe she would be unfaithful to him or neglectful of the children. At least, that was the situation until the latter part of October 1964 when he overheard a conversation between his wife and Spencer late at night outside his bedroom door. He described it as "pretty passionate" and said they were "smootching." When his wife came to bed he said he told her, "Lois, you better wake up right now or you're not going to have a home to live in", and she said, "Go to hell." It appeared Spencer had

remained near the doorway, heard that conversation, and despite the late hour packed up his things and left the house.

Thereafter defendant began to wonder about her tantrums and impatience with him earlier in the summer and recalled the large amount of time she had spent with Spencer outside his presence, a fact she admitted but said defendant himself directed her to seek Spencer's aid in household tasks. His questions brought piecemeal admissions of improprieties but a denial of infidelity.

On December 24, Christmas eve, however, she told him of her adulterous relationship with Spencer in August and September, but said she had ceased those acts. Shocked at this revelation, defendant summoned Spencer in order that all three could discuss their problem and future relationship. Defendant said Spencer at first denied the relationship, but when plaintiff told him she had confessed, he said nothing. Defendant testified Spencer "bawled" a long time and admitted he loved defendant's wife. This testimony was not denied. When Spencer was called as a witness by defendant he refused to answer, under Code section 622.14.

It seems, however, that Spencer and plaintiff did not agree to terminate their friendship or association. In fact, it appeared they did not terminate it, for on more than one occasion thereafter they met and were seen together.

One morning in the following May, when defendant came in from the fields, he found them together in the living room of their house conversing. He said he pushed them both out on the porch, telling them they should discuss their problem outside the children's presence. Several others working in the barnyard observed Spencer's long visit. Undoubtedly this event completely upset defendant and caused his doubts and fears to return. His interrogations were more intense and, in answer to her explanations, he would say, "how do I know now?"

. . Plaintiff freely admits her adultery, but contends those acts were condoned by defendant when he did not take action against her for divorce, gave her back rings she had taken off sometime before and flung on the floor, and continued his relations with her until she left in October 1965. It is her contention that his

accusations, name-calling, and treatment of her since this alleged condonation, amounted to cruel and inhuman treatment and justifies the relief granted. We cannot agree.

Section 598.8, Code 1966, provides: "Divorces from the bonds of matrimony may be decreed against the husband for the following causes: 1. When he has committed adultery subsequent to the marriage. * * * 5. When he is guilty of such inhuman treatment as to endanger the life of his wife."

Section 598.9 provides: "The husband may obtain a divorce from the wife for like cause, * * *."

Section 598.14 provides: "When a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right. * * *."

I. Although the law and the legal principles are well established, this court has said many times that legal precedents are of little value in cases of this type. Each case must, from necessity, depend upon the specific facts involved. Zuerrer v. Zuerrer, 238 Iowa 402, 404, 27 N.W.2d 260; Leigh v. Leigh, 247 Iowa 358, 360, 73 N.W.2d 727, and citations.

II. Although we recognize and adhere to the rule that we give serious consideration to the decision of the trial court in matters of this kind, we have never given it the force and effect of a finding of fact in a law action. We have also said this does not mean we are bound by the findings and decree of the trial court if the record fairly shows it fails to do equity. In such cases this court is not relieved of its duty to try the case de novo. Cole v. Cole, 259 Iowa 58, 143 N.W.2d 350, 352, and citations.

III. Condonation, as the term is used in such matters, is the forgiveness of an antecedent matrimonial offense *on condition* that it shall not be repeated and that the offender shall thereafter treat the forgiving party with conjugal kindness. *Full knowledge* of the matrimonial offense is an essential element of condonation and, to revive the original offense by subsequent misconduct of a different nature, it is not essential that the misconduct be such as, in itself, would justify a divorce. Zuerrer v. Zuerrer, supra, 238 Iowa 402, 407, 27 N.W.2d 260, and citations;

27A C. J. S., Divorce, section 60; Leigh v. Leigh, supra, 247 Iowa at 362, 363.

■ ■ To be available to either party as an affirmative defense, condonation must be pleaded. Nichols v. Nichols, 257 Iowa 458, 133 N.W.2d 77, 79; Kentzelman v. Kentzelman, 245 Iowa 579, 583, 63 N.W.2d 194; but see Weatherill v. Weatherill, 238 Iowa 169, 25 N.W.2d 336. The burden of proof, of course, is on the person asserting it. Leigh v. Leigh, supra.

■ IV. We have searched this record carefully and can find therein neither the quantity nor quality of proof which we deem necessary to entitle either of these parties to a decree of divorce based upon their allegations of cruel and inhuman treatment. Section 598.8(5). Nothing more appears than a failure of each to afford the other conjugal kindness.

This is not a case of physical violence, but of course this charge may be established by other acts of cruelty. We have often said mistreatment which deprives a person of needed rest and peace of mind may so affect one's nervous system and bodily function as to undermine his health and thereby endanger his life as effectively as blows or bodily abuse, whether the victim be a man or a woman. Littleton v. Littleton, 233 Iowa 1020, 10 N.W.2d 57; Zuerrer v. Zuerrer, supra.

■ To determine whether grounds for divorce under this allegation appear, it is necessary to consider not only the period after December 24, 1964, but the entire record of the married life of these parties. Kentzelman v. Kentzelman, supra; Murray v. Murray, 244 Iowa 548, 57 N.W.2d 234; Meyer v. Meyer, 169 Iowa 204, 151 N.W. 74.

Here both parties were guilty of neglect, but apparently for different reasons. His reason perhaps was work, hers a desire to be noticed and admired. For reasons of their own, both had unkind words for the other and, due to large and small things, arguments frequently arose between them. There is evidence each was somewhat critical of the other in the presence of third parties, except perhaps the children. They became incompatible, but we find no acts or attitudes not related to the adultery matter which would justify a dissolution of this marriage.

It appears defendant slapped her on one or two occasions. She tried to hit him in the face several times. He called her a "tramp" and, she says, other names often associated with her transgression, that he criticized her meals, housekeeping, habits and dress. Even if these unkindnesses were frequent, we find no evidence that she was of an extremely sensitive nature, nor was there a substantial showing that this treatment injured her health and endangered her life. The evidence was to the contrary, for she herself testified their quarrels and disputes did not cause her to lose any sleep. It seems fair to conclude defendant's attitude and conduct caused her no real concern—anger perhaps, but not fear for her health or welfare.

On the other hand, it is undisputed that defendant was devoted to his work and to the children. His faith and trust in his wife had been badly shaken, and it is easy to understand his reluctance to believe his wife had told him all about her Spencer affair or had reformed, especially after his discovery in May 1965. It is understandable that he doubted he was the father of the child she conceived in June of 1965 after she told his father, "I have been unfaithful to Dean and I am pregnant." Expressions of his doubt and denial of paternity under these circumstances, although perhaps cruel, only indicate he was not convinced she had told him the whole truth.

Her efforts to strike her husband, her tantrums, her criticism of him, her feeble attempts to commit suicide, her defiance of his requests that she desist in her drinking and get the children home at reasonable hours, her neglect of the children and her household chores, and her false accusations of his unfaithfulness, we think were not sufficient to justify a finding of cruel and inhuman treatment under the statute. However, it does appear her conduct and associations with Spencer seriously disturbed defendant and may have affected his health. He said that after he had heard the commotion outside his bedroom door, he could not sleep, that thereafter he had a continual headache, and every time they quarreled her attitude so upset him he could not get to sleep. He said this affected his appetite, and "I get to the place where I can't stand up." However, there was no showing that he stopped work or that his health was seriously affected.

We are satisfied he too failed to sustain his allegation of cruel and inhuman treatment such as would entitle him to a decree.

True, we may have approved divorces with a weaker showing, but under this record we think defendant's allegation and proof of plaintiff's adultery alone is sufficient to justify a decree in his favor. If these parties were to forget and forgive, the aggrieved party was entitled to know the whole truth and to be assured by word and deed that the whole morbid affair involving plaintiff was forever finished. His doubts, due to the piecemeal revelation by his wife, naturally resulted in questions. Over the next month or two these were not unreasonable or improper and should have been expected. They were natural and should have been welcomed by plaintiff if she was sincere. The interrogations to which she objected appear to have fallen off in March and April and it seems the past would have been forgotten had not Spencer reappeared on the scene in May. It is not surprising or unnatural that new doubts and gnawing suspicions would arise, and with them renewed questions were the most restrained of things to expect, after the May occurrence. But even then defendant, for the sake of the children he said, did not ask his wife to leave.

They talked of divorce, sought the advice and help of an attorney, a minister, and their own parents. This did not solve their problem, and in October 1965 plaintiff, with the children, left the home and commenced this action for divorce. We are satisfied her treatment of him could not be called *conjugal kindness* and, although not technically cruel and inhuman, was sufficient to revive the adultery charge.

V. Plaintiff's plea of condonation is found in her answer to defendant's cross-petition alleging adultery. Although she does not claim defendant forgave her nor prove he agreed to forget her past misdeeds, she contends by his acts this result was accomplished. He does not deny he remained with her, gave her back her discarded rings, and continued to have sexual relations with her, but he maintains this was only a good faith effort on his part to work things out between them and to maintain the home for their children, and that any condonation was conditional upon her behavior and demeanor toward him. He says

the evidence clearly shows she failed to fulfill those conditions and that she did not cease her interest in the other man. She does not deny that she continued to talk to Spencer by telephone and meet him on occasions unrevealed to defendant. Under such a situation it is not surprising that hope would wane with faith and trust, and confusion replaced them when plaintiff announced that she expected another child. While we cannot condone defendant's rejection of this child, we can understand his doubt and concern. Until or unless there is a legal determination that this child is not his, he must assume its responsibility. There is insufficient evidence before us to sustain such a finding and this is not the type of action to make such a determination.

As we have often pointed out, a spouse should not be punished for sincere efforts to save a marriage. Hancock v. Hancock, 257 Iowa 119, 131 N.W.2d 757, 759; Bouska v. Bouska, 249 Iowa 281, 285, 86 N.W.2d 884, 886; Howe v. Howe, 255 Iowa 280, 285, 122 N.W.2d 348, 351. In the light of all the circumstances, we are satisfied there was a sufficient showing here to revive the adultery charge, that condonation was not established, and that defendant should be granted a divorce on the statutory ground set out in section 598.8(1).

VI. We come now to the difficult issue as to who should be granted custody of these children. Apparently both plaintiff and defendant love and want the custody of the three older children, a boy Jairus now 10 years old, and two girls, Julie and Janeen, now 8 and 7 years of age. Defendant does not desire the custody of the baby born February 28, 1966, and we grant the custody of this child to plaintiff.

Again the law and applicable legal principles in child custody cases are not in issue. The polestar, the first and governing consideration of courts in custody matters, is and must be the best interest of the child. Rule 344(f)(15), Rules of Civil Procedure. There is no hard-and-fast rule as to which parent or other person should be awarded the custody of minor children. Huston v. Huston, 255 Iowa 543, 555, 122 N.W.2d 892, and citations; 27B C. J. S., Divorce, section 308b; 39 Am. Jur., Parent and Child, section 20. Nor is it the parental desires or wishes that control, but rather where the best interest of the

child will be served. Indeed, we often overlook a past misdeed of a parent, for it is not reward or punishment that enters into such awards, but considerable weight must be given to evidence as to the habits and propensities of the parties desiring custody of children. Andreesen v. Andreesen, 252 Iowa 1152, 1157, 110 N.W.2d 275, and citations.

The record in the case before us paints an undisputed picture of a mother who, regardless of any sincerity of purpose or feeling of love for her children, is beset with a moral and functional weakness which has not only wrecked her marriage but indicates she may be incapable of giving these children the care, attention and guidance which they should have. It is clear her conduct in their presence, her immorality without remorse, her admitted inability to maintain a tolerant and balanced relationship with her husband, plus her failure to detect the evils present in allowing her children to drink beer and liquor, must be considered significant in determining what is best for their future welfare. In Wendel v. Wendel, 252 Iowa 1122, 1126, 109 N.W.2d 432, we said: "Not every act of indiscretion or immorality should deprive a mother of the custody of her children, but * * * certainly any moral transgressions of the mother must be considered, together with other relevant factors, in determining what is best for the child."

So here, even if it be assumed that plaintiff's conduct was entirely motivated by her unhappy relationship with her husband, she is shown to have weaknesses which may overrule any natural preferential aptitudes which a mother should have toward the care of her children, and these weaknesses tend to show she is not now the best parent to look after their future welfare and interest.

On the other hand, it appears that the father is a man of sound judgment, patient beyond belief, abounding in energies and capabilities for earning a living and providing comfortable housing for his children. He has refused to keep liquor in the home, has gained the respect, confidence and love of his young son who recently demonstrated his desire to be with his father, and has constructed a modern home for the children in the local-

420

ity where they have lived and attended school. In addition, we have found him not at fault in this divorce action.

There is undenied testimony that plaintiff, on several occasions, made the statement that defendant would be the more capable to rear the children, and her only complaint in that regard was that he was overzealous in an attempt to inspire the children to do better schoolwork, that he overpressured them.

It is true, we have recognized that, when other things are equal, small children should be entrusted to the mother. However, that feeling indulges in the premise that the fundamental attributes of gentleness, moral stability, honesty, and a sense of value in the field of education, ambition and achievement are somehow stronger and more pronounced in mothers than in fathers. We think the evidence here reveals the opposite is true as to these parties. In Andreesen v. Andreesen, supra, 252 Iowa 1152, 110 N.W.2d 275, Maron v. Maron, 238 Iowa 587, 28 N.W.2d 17, and Stillmunkes v. Stillmunkes, 245 Iowa 1082, 65 N.W.2d 366, we considered those contentions and said that there is no hard-and-fast rule as to which parent should be awarded the custody of the children, that each case had to be judged on its own facts, that so-called presumptions in favor of a mother of small children had been resorted to to aid the court, when all other things appeared to be equal, in the determination of what is for the best interest of the children. "No one should be awarded the custody of children where their welfare will be served by placing them with another custodian." Maron v. Maron, supra, on page 592 of 238 Iowa.

The trial court declined to talk with the children, and was well within its discretion in so doing, but in the light of evidence as to the boy's apparent maturity and express desire to be with and work with his father, we think that interview might have been helpful. As bearing on when such interviews might be considered and helpful to the court, see annotation in 4 A. L. R.3d 1396, 1402.

Plaintiff contends we should not interfere with the decree of the trial court on this custody issue unless it is shown to be an abuse of discretion, citing Pearson v. Pearson, 247 Iowa 437, 74 N.W.2d 224, and Gesmacher v. Gesmacher, 247 Iowa 836, 76

N.W.2d 790. However, as pointed out in White v. White, 251 Iowa 440, 443, 101 N.W.2d 18, this does not take from the appellate court its right, nor relieve it of its duty, to try the case anew. It means only that on disputed issues of fact where much depends upon the credibility of the witnesses and the appearance and demeanor of the litigants, we give weight to the findings of the trial court. This is especially so in matters of child custody. Patzner v. Patzner, 250 Iowa 155, 162, 93 N.W.2d 55., Here there is little dispute as to the relevant facts, and under such circumstances we will make our own findings as to what will be for the best interest of these children.

This record discloses that prior to the separation of these parties they acquired a farm in the neighborhood where the children had always lived and near the homes of their maternal and paternal grandparents and remodeled a modern seven-room residence thereon with ample room to rear these children, that defendant expects to live there, and that he is able and willing to give them a wholesome, moral, religious and advantageous homelife. It appears he has or can obtain household help and, when the day's work is done, he will probably associate with the children as was his custom in the past.

Although we do not believe plaintiff would cease to love and care for these children, it is evident she cannot offer the homelife to which these children have been accustomed. By affidavit filed herein December 23, 1966, she expects to live in a house in Winterset, Iowa, being purchased by her and her mother on contract. What she expects to do for a livelihood is not shown.

It is our conclusion that the three older children's best interest will be served by granting their custody to the defendant, and we so order.

VII. The correctness of the trial court's provision as to the amount of alimony or property settlement is not seriously disputed, except as to the time and manner of payment. Practically all of their property was accumulated by their joint efforts. However, it would appear that defendant could not raise or pay $6900 in a lump sum to plaintiff without liquidating his farm operations and destroying his ability to provide an adequate livelihood for the children. This would not be advisable.

Therefore, that provision must be modified to provide that defendant pay plaintiff $6900 at the rate of not less than $1000 per year, with 5 percent interest accruing on the unpaid balance.

VIII. Support payments for the child born February 28, 1966, shall be fixed at $50 per month until such time as the child reaches his majority, dies or becomes self-supporting, such payments to be made to the clerk of court on the first day of each month commencing thirty days after the entry of this decree.

The trial court's order that defendant pay all the medical expenses incident to the care and treatment of plaintiff during "her present pregnancy" and the birth of the child "expected" is approved and adopted herein, but in view of our findings and decision in favor of defendant, plaintiff's attorney fees to be paid by defendant are reduced to $500, and her attorneys are allowed an additional fee of $300 for services incident to this appeal.

IX. Reasonable visitation rights with the children are granted both parties as they shall agree, but shall not be less than two days each month. If the parties cannot agree as to when visitation rights may be exercised or for how long, the trial court shall specify details.

X. The costs, including the cost of this appeal, shall be paid by defendant.—Affirmed in part, reversed in part and modified.

All JUSTICES concur.