Sheryol L. KAYSER, Appellant,

v.

Larry R. KAYSER, Appellee.

No. 53250.

Supreme Court of Iowa.

Jan. 14, 1969.

Wagner & Wagner, LaPorte City, for appellant.

D. Quinn Martin, of Kildee, Keith, Gallagher, Lybbert & Martin, Waterloo, for appellee.

MOORE, Justice.

Plaintiff-wife brought this action for divorce on the grounds of cruel and inhuman treatment. Defendant-husband counterclaimed for a divorce on the grounds of cruel and inhuman treatment and adultery. The trial court dismissed plaintiff's petition, granted defendant a divorce, awarded custody of the parties' two minor sons to

defendant, ordered property division, payment of attorney fees by defendant and taxed the costs against plaintiff. She has appealed.

The parties were married June 10, 1961 in Waterloo, Iowa, where they lived together as husband and wife until commencement of plaintiff's action January 20, 1967. Two sons were born as issue of this marriage, Jeffrey and Daniel, ages 5 and 2 respectively at trial time, August 3, 1967.

Defendant was steadily employed at the John Deere Waterloo Tractor Works throughout the marriage. To enhance his chances for advancement he took courses of study at the University of Northern Iowa. His earnings of $525 per month were sufficient to provide a reasonable and comfortable standard of living for the family.

Plaintiff voluntarily, and at times over defendant's objection, engaged in part or full time employment outside the home throughout most of the marriage except for necessary periods of time for birth of the boys. She stated on many occasions she did this because of her high strung, nervous temperament which caused her to become extremely nervous and irritable if cooped up with the children throughout the day. The children spent most of their waking hours during week days with a succession of baby sitters. At trial time, plaintiff, then age 26, was employed as a clerk in the Black Hawk County Sheriff's office at a salary of $290 per month.

Plaintiff testified she started the divorce action due to the circumstances under which the parties were living, they had no communication, nothing seemed to be in common and "we grew apart."

She complained of defendant's conduct following their return from a New Year's Eve party December 31, 1966 at which each had some liquor. Defendant slapped her in the face following a discussion regarding her absence from the party group with another man and her refusal later in their

home to have sexual intercourse with defendant. She stated he had never physically abused her before or after this incident and that was the only time he ever directed profanity to her. To her knowledge defendant had never paid attention to any other woman.

Plaintiff's testimony in summary form from the record includes: "Physically, no, he had never actually harmed me. Mentally, yes, I was. I was at no peace of mind, I had no communication, I could not talk to Larry, and this upset me terribly.

"Q. What would he do or say, if anything, that gave you no peace of mind? A. Well, how do you say it? There is just no communication, I couldn't communicate with this person, no matter how hard I tried or what kind of a problem I had or how depressed I was I would try and approach him, and I got no reply.

"Q. You got no assistance in any problems that you had from him? A. No.

"Q. How did he treat you socially prior to New Years Eve? Would you go out on occasion or often? A. Yes, we would go out quite often.

"Q. And did you enjoy those evenings? A. Oh, probably I enjoyed them. Not fully, no.

"Q. And why was that? A. Well, I can't say why. I really couldn't, I couldn't say. I don't know. I think probably towards the end there I was just at such a depressed stage that no matter what I did, I simply didn't enjoy anything.

"Q. Were you more depressed shortly prior to January 20th than say two months before that time? A. No, I had been depressed, in a depressed stage for quite a while, I would say for a good year and a half. It maybe reached a point where it got a little bit better, I thought things were working out and then it wouldn't."

She further testified that during the last year defendant insinuated she was seeing

other men but that he had not actually accused her of adultery until a week before the trial. When asked if there was any foundation for the insinuations she answered: "No, I think only what he thought and my reactions towards him, I think he felt that because of my reaction and feeling toward him, I was serving some one else in my return." During the last year and a half she had often refused to have intercourse with defendant.

Plaintiff testified defendant's conduct made her nervous and upset—caused her to lose weight.

On cross-examination plaintiff testified her marriage did not start off right, she had been unhappy in her marriage for a number of years, there was a lack of communication between the parties and incompatibility was a reason for their marital problems.

The parties had been very close friends with Mr. and Mrs. James Ackey for several years. Plaintiff admitted that one evening in the spring or summer of 1966, Mr. Ackey was in the home of the parties and kissed her. She stated she responded to his kiss and the next morning she had a whisker burn on her person as a result of her contact with Mr. Ackey. Defendant was working that evening. The next morning he noticed the burn and plaintiff then admitted she had a man in the house the previous night and had kissed him. She did not disclose his identity until later. Mr. Ackey's version of what happened will be set out infra with his other testimony.

Part of plaintiff's testimony on cross-examination in narrative form in the record includes: "That for many months prior to filing her petition for divorce plaintiff had felt no love for defendant; that she did not want sexual relations with him and she often refused him by saying she was too tired or unwell and often refused him without giving any reason. That she had long had a feeling of revulsion toward him and arrived at the point where she could

not force herself to have intercourse with him. That she could not pinpoint any conduct on the part of the defendant which caused these feelings toward him. That from the time the parties were married until a petition was filed the defendant used abusive language toward her only on the occasion of the New Year's Eve incident.

"That an old male friend of the plaintiff, Barry French, had visited her at her home when she was alone on one or two occasions more than two years previous to the trial; that within the past two years she had met Mr. French in Des Moines and had had a drink with him in her motel room. That she had also written to the said Mr. French in Des Moines and had asked him to send a reply to her girl friend's address. That after the divorce petition was filed two male acquaintances visited her at her home and she visited one of them, Phil Irwin, while he was in jail. That prior to filing the petition she had contacts with Phil Irwin which her husband disapproved of for the reason that he did not want to mix socially with Irwin.

"That within a week or so of filing her petition the plaintiff told Mrs. James Ackey that she had stepped out on the defendant with a man; that he was married and had children and as a result of this experience she realized that she could have a feeling toward a man which she did not have for the defendant."

Plaintiff stated defendant's insinuations did not start until after she had admitted kissing Mr. Ackey.

When asked about her attitude about working as opposed to staying home with the children plaintiff stated: " * * * I have never denied the fact I felt cooped up with my children. I said because of my personality because of how I am, I am better toward my children when I am working." She stated she intended to work after the divorce even if she obtained custody of the children.

Plaintiff further testified she is a Roman Catholic by conversion, she had not taken the children to church since filing the divorce petition, she had not gone to church herself, she was confused as to her own religious beliefs and had asked defendant to allow her to take their children to a Protestant Sunday School. She made no claim difference of religious beliefs had caused any marital difficulties.

Three women friends of plaintiff testified regarding conversations with plaintiff regarding her unhappy marriage and their observations she was nervous, upset and had lost weight. One stated plaintiff's condition had improved after filing of her divorce petition. None claimed to have personal knowledge of the cause of plaintiff's nervous condition. Each opined she was a good housekeeper and mother.

Ruling on defendant's motion to dismiss plaintiff's petition on the ground of insufficient evidence was reserved by the court and ordered submitted with the whole case.

Mrs. James (Sally) Ackey was called as a witness by defendant and after relating their close friendship with the Kaysers over several years stated plaintiff had frequently talked with her about plaintiff's marital problems. Regarding the New Year's Eve slapping plaintiff told Mrs. Ackey she had pushed defendant to act and she did not hold it against him.

Mrs. Ackey stated plaintiff had told her that for about two years before filing for divorce she had found sexual intercourse with defendant repulsive and frequently refused to have relations with him although she knew her refusals bothered him. Both before and after the divorce petition was filed plaintiff told Mrs. Ackey she did not have very good grounds for divorce and her main reason for seeking a divorce was because she did not love her husband and they did not get along.

Mrs. Ackey further testified that about a week before the divorce petition was filed plaintiff told her she had an affair with another man, she had had intercourse with him, the man was older than plaintiff and had children who were older than her own. Also that plaintiff told her the other man was married, she had no hope of marrying him but refused to give the man's name.

Two or three weeks later plaintiff told Mrs. Ackey the affair had been broken off but that the affair showed her she could love a person completely which she could not do with defendant.

Mrs. Ackey further testified that on another occasion plaintiff stated Barry French had visited her in her home after she was married, she had met him in her motel room in Des Moines and they had kissed.

She further testified she had seen defendant with his children on many occasions, the boys were happy with him and defendant was a good and capable father.

On cross-examination Mrs. Ackey stated plaintiff was a good housekeeper, concerned with the welfare of her children and a fine mother.

James Ackey testified the two couples for the past four or five years had been close socially and one evening in the spring of 1966 he stopped at the Kaysers, defendant was not at home, he talked with plaintiff and as he was leaving she grabbed him, tried to kiss him, he pulled away and then plaintiff asked him not to mention the incident to his wife.

Ackey further testified that a few days after plaintiff filed her divorce petition he telephoned and talked to her about the possibility of a reconciliation. He told plaintiff Mrs. Ackey had related to him plaintiff's admissions of having sexual intercourse with a man other than her husband and suggested she should see a psychiatrist. He stated plaintiff said these things happen, there is nothing you can do about it and that she did not deny having committed adultery.

He further testified defendant was a good father and the boys were happy with

him. On cross-examination he stated plaintiff was a good mother to her boys.

Susan E. Nitsch, an acquaintance of the parties and close friend of plaintiff for several years, testified that in the spring of 1966 plaintiff said she did not love defendant, she didn't want any part of him, she was bored, she wasn't having any fun out of her married life, this was a fast and fleeting life, she wanted to enjoy it and it was sort of a noose around her neck to be married.

Plaintiff told Mrs. Nitsch defendant was a good husband and father, but even so she wanted a divorce, she felt she did not have grounds and hoped defendant would do something wrong and give her grounds for divorce.

Mrs. Nitsch advised plaintiff to become active in a woman's group to which plaintiff replied she just liked men and a woman's group would bore her and she was already bored.

Plaintiff told Mrs. Nitsch of kissing James Ackey, meeting Barry French in a hotel room in Waterloo, of writing letters to French and giving Mrs. Nitsch's address in event he answered.

Mrs. Nitsch did not tell defendant of these conversations until after this divorce action was begun. She stated plaintiff was a flighty unstable person and the children would be better off with their father.

Defendant testified the parties had a fairly happy life until about March 1966 when plaintiff began saying they were different types, she did not love him, she had no feeling for him and refused to have sexual relations. This conduct continued throughout the remainder of their married life. He related observing the burn mark on plaintiff's person and her admission she had kissed another man the night before. She did not disclose his identity until two or three days later. He related also the event of the New Year's Eve party and plaintiff's conduct at the party and later in

their home. He admitted he became angry and slapped her in the face but that later plaintiff stated she had upset him and did not hold the slapping incident against him.

After the divorce petition was filed plaintiff told defendant "he was a nice guy but nice guys don't make good husbands."

Soon after plaintiff's petition was filed she told defendant that in December 1966 while in Des Moines shopping, Barry French, with whom plaintiff had gone before her marriage, visited her in her motel room, they had a drink together and he kissed her.

Shortly before trial defendant confronted plaintiff with the fact two people had told him she had admitted adultery to them. In response she stated it did not matter what she had done she still felt she should have the children. He testified plaintiff did not deny the fact of adultery.

Defendant and his mother testified plaintiff's conduct caused him to be nervous, sleepless and caused him an outbreak of eczema which was very bad in December, 1966.

Defendant expressed love and great concern for the two sons and his willingness to give them good care and attention. He expressed a desire to have the three bedroom house in which the parties had an equity of approximately $1300 and to maintain the children with the help of his parents who would also live there.

On rebuttal plaintiff denied telling any of the witnesses she had had sexual intercourse with any man other than her husband and stated she had not committed adultery.

Plaintiff's ten assigned propositions of error can be grouped and considered under three general propositions, the trial court erred in (1) finding plaintiff was not entitled to a divorce, (2) defendant had established sufficient grounds for divorce and (3) granting defendant custody of the two children.

Section 598.8, Code 1966, provides: "Divorces from the bonds of matrimony may be decreed against the husband for the following causes: 1. When he has committed adultery subsequent to the marriage. * * * 5. When he is guilty of such inhuman treatment as to endanger the life of his wife."

Section 598.9 provides: "The husband may obtain a divorce from the wife for like cause, * * *."

Section 598.14 provides: "When a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right. * * *."

■ I. Many opinions have been written applying these statutory provisions and setting out the proof necessary to establish grounds for divorce under section 598.8(5). The applicable legal principles are summarized in Beno v. Beno, 260 Iowa 442, 149 N.W.2d 778, and most recently repeated in Schantz v. Schantz, Iowa, 163 N.W.2d 398, filed December 10, 1968. They need not be repeated in detail here. There is no real disagreement between the parties regarding the applicable legal principles as to what must be shown to establish grounds for divorce under section 598.8(5). Cruel and inhuman treatment must be to the extent to endanger the life of the offended spouse.

■ II. Our review is de novo. Rule 334, Rules of Civil Procedure. Especially when considering the credibility of witnesses, we give weight to the fact findings of the trial court but are not bound by them. Rule 344(f), par. 7, R.C.P.; Britven v. Britven, 259 Iowa 650, 145 N.W.2d 450, 451; Beno v. Beno, supra. Here the trial court's findings include plaintiff's "evasiveness on the witness stand."

■ III. We have set out at great length much of the evidence as each case involving marital difficulties, from necessity, depends upon the specific facts involv-

ed. Precedents are of little value. Zuerrer v. Zuerrer, 238 Iowa 402, 404, 27 N.W.2d 260, 261; Fritz v. Fritz, 260 Iowa 409, 148 N.W.2d 392, 395; Beno v. Beno, supra; Burlingame v. Burlingame, 260 Iowa 18, 148 N.W.2d 493, 494.

■ IV. Incompatibility or mere family quarrels or arguments, even when accompanied by minor physical applications, are not grounds for divorce under section 598.8 (5). Jones v. Jones, 255 Iowa 103, 108, 121 N.W.2d 668, 671; Elliott v. Elliott, 259 Iowa 1286, 147 N.W.2d 907, 909 and citations.

■ V. In determining whether plaintiff's life was endangered by defendant's conduct it is necessary to consider the entire record of their married life and not separate incidents. Howe v. Howe, 255 Iowa 280, 285, 122 N.W.2d 348, 351; Elliott v. Elliott, supra; Schantz v. Schantz, supra. Contrary to plaintiff's contention we are convinced the trial court followed this rule.

■ Our review of the entire record leads us to agree with the trial court's conclusion plaintiff failed to prove her alleged ground for divorce. At most she established nothing more than incompatibility.

■ VI. The trial court found defendant had proved grounds for divorce but did not specifically find plaintiff had been guilty of such cruel and inhuman treatment as to endanger defendant's life. We need not decide this question as the evidence does establish plaintiff committed adultery.

Plaintiff argues failure to allege and prove the name of any man with whom she committed adultery barred a divorce on the ground of adultery. In other words she contends adultery cannot be proved unless a specific time and name of the participant is alleged and proved. She cites no authority in support of this proposition. We have not heretofore decided this question. The authorities are heavily against plaintiff's position.

24 Am.Jur.2d, Divorce and Separation, section 365, page 501, states: "As a general rule, in the absence of statutory provision to the contrary, the admissions and confessions of the defendant in a divorce suit are competent to prove the facts alleged as ground for divorce. Thus, it is generally held that the admissions of the defendant are competent to prove adultery on his or her part. The general practice seems to be to admit admissions and confessions for what they may be worth, but to require corroboration before granting a divorce."

Section 367, pages 502, 503, states: "It is clear, upon both principle and authority, that in proceedings for divorce on the ground of adultery, whatever directly tends to show the commission of the charge is admissible in evidence, subject, of course, to limitations by statute or otherwise. It is not, however, necessary that the evidence on the issue of adultery be limited to that which will directly prove the fact of adulterous acts; circumstantial evidence from which adultery may reasonably be inferred is competent. In fact, adultery is seldom susceptible of proof except by circumstances which would lead to a conclusion of guilt. The courts must take such evidence, circumstantial, direct, or positive, as the nature of the case permits, and bring to bear upon it the experience and observations of life, thus weighing it with prudence and care and giving effect to its just preponderance."

Under the heading "Adulterous disposition" the editor in section 369, page 504, says: "The intent and disposition of the parties toward each other give character to their relations and can be ascertained only from the acts and declarations of the parties. It is true that the fact to be proved is the disposition existing at the time of the act charged; but the indications by which it is proved may, and ordinarily do, extend over a period of time both prior and subsequent to it. The rules governing human conduct and known to common observation and experience are applied in these cases as in all other investigations of fact. Thus, it is a general rule that evidence having a logical tendency to prove an adulterous disposition or infatuation between the defendant and his or her alleged paramour is admissible."

Section 392, pages 521, 522, states: "Adultery may be proved by circumstantial evidence. Direct proof by an eyewitness to the offense is not required. The courts must, perforce, take such evidence as the nature of the case permits—circumstantial, direct, or positive—and bring to bear upon it the experiences and observations of life, thus weighing it with prudence and care and giving effect to its just preponderance."

Similar statements are found in 27A C.J.S. Divorce §§ 125, 129 and 137. See also Anno. 40 A.L.R. 630.

In Shoemaker v. Shoemaker, 199 Pa. Super. 61, 184 A.2d 282, the facts are similar to those here. The court affirmed a divorce granted on the ground of adultery. At page 285, 184 A.2d the court says: "Of course, it is not necessary to prove the adultery independent of the confession, for then the finding of adultery would stand not on the confession but upon those independent circumstances. Evidence far short of proving adultery is sufficient to corroborate the confession. State v. Guild, 10 N.J.L. 163, 18 Am.Dec. 404 (1828). The confession is corroborated when there is evidence which adds weight or credibility to the confession by establishing additional and confirming facts. To corroborate means to strengthen, to make more certain, to add weight or credibility." And at page 286 says: "There can seldom be direct evidence of adultery as it is almost always committed in secret, but it can be proved by circumstances which would lead the guarded discretion of a reasonable and just man to a conclusion of guilt."

Some states have statutes expressly prohibiting a divorce based solely on admissions made to third parties. These statutes generally require some amount of corrobo-

ration as a prerequisite to the admissibility of these confessions or admissions. We have no such statute.

The weight of authority is that such admissions are admissible as a link in the chain of circumstantial evidence if they are supported by corroborating evidence. The rule seems sound for two reasons, (1) corroboration will avoid to some extent the possibility of collusion and (2) adultery is such a difficult charge to prove by direct evidence that admissions to third parties may be the only method of bringing the matter to the court's attention.

The case at bar is being vigorously contested on defendant's allegation of adultery and we are convinced there is no collusive element here. The specific findings of the trial court reveal his decision was not based entirely on plaintiff's admissions. Plaintiff's testimony, her conduct toward defendant, including seeking a divorce knowing she had no grounds therefor, her display of an adulterous disposition and her failure to deny making admissions of adultery add up to strong circumstantial evidence of the truth of her admissions.

Our review of the whole record leads us to the conclusion plaintiff committed adultery and the decree granting defendant a divorce on his counterclaim must be approved.

VII. The divorce decree entered by the trial court gave the parties their respective separate personal property. Plaintiff was given a 1962 Ford subject to the encumbrance thereon and was awarded $1500 to be paid by defendant within six months. Defendant was awarded the parties' equity in their three bedroom home and the basic household goods and possessions therein. He was ordered to pay $300 as partial payment of plaintiff's attorney fee. No error is assigned regarding property division but it is apparent therefrom the trial court intended the two boys would continue in the home to which they were accustomed.

Defendant was given custody of the two boys with reasonable rights of visitation granted plaintiff. The area of such visitations was limited to within the State of Iowa. Plaintiff argues she should have been given custody of the children. She assigns this proposition as follows: "The Trial Court erred in giving Defendant-Appellee custody of children without first finding Plaintiff-Appellant to be an unfit mother."

In child custody cases the first and governing consideration of the courts must be the best interest of the child. Rule 344(f), par. 15, R.C.P.

There is no hard-and-fast rule as to which parent or other person should be awarded a child's custody. Each case must be judged on its own facts. Any presumption in favor of a mother of a young child is resorted to merely to aid the court in a particular case to determine what is for the child's best interests. No one should be awarded a child's custody where the welfare will be served by placing it with another. Maron v. Maron, 238 Iowa 587, 592, 28 N.W.2d 17, 19, 20; Andreesen v. Andreesen, 252 Iowa 1152, 1156, 1157, 110 N.W.2d 275, 277, 278; Huston v. Huston, 255 Iowa 543, 555, 122 N.W.2d 892, 900; Fritz v. Fritz, 260 Iowa 409, 148 N.W. 2d 392, 398.

Not every act of indiscretion or immorality should deprive a mother of her child but certainly they must be considered together with other relevant factors, in determining what is best for the child. Wendel v. Wendel, 252 Iowa 1122, 1126, 109 N.W.2d 432, 434; Fritz v. Fritz, supra.

The record before us establishes plaintiff, regardless of any sincerity of purpose or feeling of love for her children, is beset with a moral weakness which has wrecked her marriage and indicates she may be incapable of giving the two boys the care, attention and guidance which they should have. In the past she has voluntarily absented herself from them and

been content to have others care for them. There is no indication her resistance to being "cooped up" has changed. The evidence is undisputed defendant has been a good attentive father. We agree with the trial court the best interest of the boys will be served under the provisions made in the decree granting custody to defendant.

We have considered plaintiff's many contentions and conclude the holding of the trial court is correct.

Affirmed.

All Justices concur.