**Jean L. MILLER, Appellant,**

v.

**Thomas E. MILLER, Appellee.**

**No. 55107.**

Supreme Court of Iowa.

Nov. 15, 1972.

Rehearing Denied Dec. 13, 1972.

 

This case involves several unusual circumstances which we dispose of before reaching the issues to be decided.

I. The first concerns plaintiff's right to continue her appeal attacking the granting of a divorce to defendant. Subsequent to the entry of the decree, plaintiff remarried. This fact came to our attention through the statement of counsel during oral argument. Thereafter defendant filed a motion to dismiss the appeal on that ground.

Of course, one may not claim a decree of divorce should be set aside and at the same time rely on its provisions to embark on a new marriage. The price of victory in that case would be high indeed—a bigamous relationship.

■ We have recently held a party who remarries while an appeal from a divorce decree is pending forfeits the right to challenge that part of the decree which dissolves the marriage. Olson v. Olson, 180 N.W.2d 427, 428 (Iowa 1970). That decision is controlling here. The decree insofar as it awards defendant a divorce from plaintiff is final.

■ However, this does not prevent plaintiff from pursuing her appeal from the decretal provisions concerning property settlement, alimony and custody. We therefore proceed to a consideration of those issues.

II. Before doing so, however, there is one other matter we should first dispose of, since it runs through this whole litigation. While we find it distasteful, we feel compelled to treat plaintiff's charge that the trial court improperly based the decree on considerations outside the record. Plaintiff alleges the judge was influenced by the personal opinion of a fellow judge with whom he discussed the case, both before it was heard and while it was being tried. Plaintiff also asserts the trial judge received damaging information from his wife concerning plaintiff's conduct and that this influenced his ultimate decision.

Henry Cutler, Waterloo, and Herrick, Langdon, Belin & Harris, Des Moines, for appellant.

Fulton, Frerichs, Nutting & Kennedy, Waterloo, for appellee.

Heard before MOORE, C. J., and MASON, RAWLINGS, LeGRAND and REES, JJ.

LeGRAND, Justice.

This appeal presents the tragic climax to a marriage which has brought strife and bitterness to the principals and inevitable resulting distress to their three minor children. After a long and acrimonious trial under the provisions of our divorce law before the repeal of chapter 598, The Code, 1966, by the Sixty-third General Assembly, the trial court awarded defendant a divorce and also gave him custody of the children. The decree included a property settlement and alimony provisions. Plaintiff appeals, challenging the result in all of these areas. Defendant cross-appeals to attack the property settlement, alimony and attorney's fees allotted to plaintiff's attorneys, all of which he characterizes as excessive. We modify and affirm on plaintiff's appeal; and we affirm outright on defendant's cross-appeal.

This unfortunate situation arose in the following manner. Judge Blair Wood, one of the judges of Black Hawk County, lives near the residence of the parties to this action. He was familiar with some of the circumstances of their marital difficulty, both from personal observation and from the unavoidable neighborhood gossip which always attends such trouble. He disqualified himself from hearing this case, and it was then transferred to Judge Van Metre. Thereafter, according to the statement of Judge Van Metre which appears as part of the record, the two judges discussed the matter on several occasions.

We set out the important parts of the record on this matter:

"Mr. Cutler: Did Judge Wood make any statements relative to the merits or his knowledge of the parties?

"The Court: He said that there was a feeling in the neighborhood generally, but that he did not know enough personally about them to know whether that feeling was true. He told me after the decision, he told me Monday morning that the neighbors were unanimous in concurring with it.

"Mr. Cutler: But as I understand it the Court did have lunch with Judge Wood and some of these conversations, as you have stated for the record, did take place during the course of the trial?

"The Court: Yes. We discussed the case. I think I got an indication that Judge Wood was more sympathetic to the defendant than to the plaintiff, and we all know how Judge Wood expresses his opinions on things. I am trying to think of statements of fact that Judge Wood might have made as opposed to expressions of his or other people's opinions.

\*   \*   \*   \*   \*   \*

"The Court: \* \* \* In the passing course of the trial during this whole week I talked to [Judge] Blair [Wood] dozens of times about hundreds of things, but quite a few times in passing about things in this case, and I know he gave me an impression of opinions. He also expressed an opinion as to Mrs. Green.

"Mr. Cutler: That's one of the witnesses who testified in Court?

"The Court: Right. And his opinion was that she was a fine woman and a good neighbor. I don't think her testimony was anything more than peripheral to the main issues in the case at best."

Later in ruling on various motions made by plaintiff the court stated in part:

"The next matter to take up is the situation engendered because of conversations with Judge Wood about this case. This is the most difficult of the matters, because as I said, it's true that in the course of conversations with Judge Wood I acquired the impression that he personally from neighborhood feelings and opinions felt that the defendant would be the more suitable person to have custody than the plaintiff. However, I can't tell you exactly how I acquired this impression, that was the impression I had before really discussing this case at all with him because of his action in disqualifying himself from the trial, and it's a matter that I am sure raises difficulties for counsel and difficulties for the parties, but it's almost impossible for the second judge in a case to be unaware of the circumstances surrounding the first judge's disqualification or withdrawal from the case and thus to know what viewpoint or opinion or idea or concept the first judge has about the case, and in a district such as ours with four judges who work closely together about the only way I can see to avoid this sort of thing would be to ask the Supreme Court to send in a judge from outside the district whenever one of our judges felt either because of opinions or connections with the parties or whatever it might be that he must withdraw from the case. As I say, admitted-

ly it's troublesome, but I am going to overrule this motion for mistrial and also state in connection therewith if I felt the question of custody to be a close one in this case or if I felt that it turned upon my judgment of the credibility of witnesses whose testimony was in serious dispute I would think this knowledge on my part of Judge Wood's opinion would be much more crucial, but the fact is that in a week's testimony not one single person who had any real familiarity with the operation of the Miller household for the last two years testified in support of the plaintiff, and the overwhelming weight of the testimony of all the witnesses who testified from any real observation of the operation of the household indicated that the best interests of the children would require an award of custody to the husband."

■ We feel plaintiff has a valid complaint. When a judge feels impelled to disqualify himself for personal reasons, as was the case here, it necessarily follows those same reasons should inhibit his successor from discussing the matter with him. When sitting as a trier of facts, a judge, like a jury, must be careful to exclude all considerations except those arising from the evidence before him. Anything less, even if it has no part in the ultimate decision, leaves the unsuccessful litigant convinced he has not had fair treatment. It is almost as important to avoid this *appearance* of unfairness as it is to avoid unfairness itself.

We strongly disapprove the trial court's failure to observe this salutary rule. By discussing the merits of the controversy with the very judge who had previously declined to hear the case because he knew too much—extrajudicially—about both the parties and the facts, the trial court begot a problem which he himself concedes to be "difficult" and "troublesome."

■ The matter is perhaps saved from more serious consequences by the fact that the appeal here is de novo. We are re-quired to make our own evaluation of the facts on the record before us. Ordinarily we give weight to the findings of the trial court, particularly when dealing with matters involving the credibility of witnesses. Rule 344(f), 7, Rules of Civil Procedure. However, in an effort to avoid prejudice to plaintiff from these circumstances, we have disregarded that rule here and have reached our own conclusions uninfluenced by the trial court's findings. See Gerk v. Gerk, 158 N.W.2d 656, 659 (Iowa 1968).

III. We come finally to the issues to be decided. They include property settlement, alimony, child custody and attorney fees. The real battleground is the question of custody. We reserve that until the other matters have been resolved.

IV. In our review of the property settlement provisions of the decree, it might be helpful to give some background facts.

Much of the marital difficulty can be characterized as in-law trouble. The record rather conclusively reflects that defendant's parents and plaintiff took an almost instant dislike to each other. This feeling seems to have been carefully nurtured by both sides throughout the existence of the marriage. Perhaps plaintiff was overly sensitive about defendant's superior financial status. His family is one of means. Defendant's only jobs were with family-owned companies. Plaintiff believed, rightly or wrongly, her husband was never compensated on a fair basis, with the differences being made up by "gifts" to him.

Again, she felt this was a deliberate family ploy to prefer him over her, since the expensive "gifts" were for him alone while she was remembered with presents of only trifling value. It is clear, too, that plaintiff believes this was done to keep defendant subservient to, and dependent upon, his family.

While plaintiff perhaps overemphasizes this element of the case, it is a matter of considerable importance because now de-

fendant argues plaintiff should not expect too much by way of property settlement because they have been living partially on the largess of his family. Much of his present net worth, he claims, also results from family gratuities.

We recently reviewed the elements to be considered in property settlements and alimony awards. Schantz v. Schantz, 163 N. W.2d 398, 405 (Iowa 1968). We also held there—and referred to supporting authorities—that precedents are of little value and that many factors must be considered in the light of the particular facts involved.

There is no reason to repeat the standards set out in Schantz. We have given all of the applicable ones full consideration in reaching our conclusion.

■ While the record is not completely clear on the question, we believe the evidence shows defendant's net worth to be approximately $45,000. Of this amount approximately $6000 is represented by premarital gifts to defendant. The balance reflects the assets accumulated during the marriage, including gifts to defendant from his family.

We hold plaintiff is entitled to one-third of the value of these assets exclusive of the $6000 given defendant before the marriage. Eliminating this item reduces the net worth to $39,000. Plaintiff should have one-third of this amount or $13,000.

V. The decree provided for payment of alimony in the amount of $150 each month until plaintiff's death or remarriage. Defendant contests the allowance of any alimony, relying on Simpson v. Simpson, 247 Iowa 546, 548, 74 N.W.2d 582, 584 (1956). In that case we held a wife may be awarded alimony even though the husband is awarded the divorce decree, but we quoted from an earlier case (Barnes v. Barnes, 59 Iowa 456, 458, 13 N.W. 441, 441 [1882]) as follows:

"Alimony is rarely, and only under peculiar circumstances, granted to the party in fault, even when that party is the wife."

■ It is doubtful, however, if we have ever given full observance to that announced rule of law, certainly not in our later cases. As noted in Schantz v. Schantz, supra, 163 N.W.2d at page 405, the conduct of the parties is only one of the factors to be considered. It is not controlling.

In Conkling v. Conkling, 185 N.W.2d 777, 786 (Iowa 1971), we allowed $500 per month alimony to a "guilty wife," saying:

"Our earlier decisions indicate that alimony should be granted a wife who is guilty of serious wrong only when she was 'the meritorious cause' of the husband's wealth and the husband was 'not without fault'. * * * The principle of later decisions, however, appears to be that the question of alimony to a guilty wife turns on all the equities in the case, with consideration being given to her guilt. * * *"

■ This statement is borne out by the authorities there cited. Applying it to the present controversy, we conclude plaintiff is entitled to alimony on the facts before us. This issue has lost much of its importance since the payments stopped on the date of plaintiff's remarriage.

Upon a review of the whole record, we find the award of $150 per month is fair and should be affirmed.

To avoid any possibility of misunderstanding, we repeat that this case comes under our divorce law before the adoption of the Dissolution of Marriage Act in 1970. Now, of course, the question of fault has no place in a consideration of either property settlement or alimony. In re Marriage of Williams, 199 N.W.2d 339, 344, 345 (Iowa 1972).

■ VI. Two problems confront us on the issue of attorney fees, one on defendant's cross-appeal and one on plaintiff's

application filed with this court asking an allowance of fees for prosecuting this appeal. We deal with them together.

Defendant says the award of $4000 by the trial court for services rendered in the preparation and trial of the case is excessive. The award represented a reduction from the requested fee of $5000.

This was a difficult case. It was bitterly contested from the outset. It involved substantial property rights and a serious question of child custody made even more complicated by the grave and chronic illness of one child. From the outset there was a lack of cooperation between the principals which only magnified the already existing problems. The trial itself lasted six days, and the amount of time spent in preparation as shown by the itemized statement of counsel was substantial. We have reviewed the whole record, and we believe that the fee allowed was a reasonable one. We see no reason to reduce it.

■ This is as good a time as any to dispose of plaintiff's request for an allowance of fees for this appeal. Without attempting to limit the amount counsel is entitled to nor to determine what is reasonable, we order defendant to pay $1500 toward the fee for plaintiff's attorney on this appeal.

VII. We come now to the most difficult and troublesome matter—the custody of the children. The decree awarded it to defendant, and this gives rise to the real contest between the parents.

Plaintiff and defendant were married in 1962. They have three children: Galen Elizabeth, born March 27, 1963; Andrew Christopher, born April 22, 1966; and Colin Peter, born June 24, 1968.

The family has had far more than its share of sickness. Galen, the first child, weighed three pounds 12 ounces at birth. She was given only a 50/50 chance to live. She was a sickly child, and when she was four years old, her condition was diagnosed as cystic fibrosis, which is described as a congenital disease concerned principally with the lungs and respiratory system. Half of its victims die before reaching their tenth birthday; eighty percent do not live to the age of twenty.

From then on her care was a constant and demanding problem. She required medication in different forms several times daily; she slept in a mist tent which had to be thoroughly cleansed daily; her bedding was completely changed daily; she underwent a daily form of physical therapy called postural drainage, a routine designed to assist in breathing; she was required to avoid extreme heat or extreme cold; she was on a specialized diet. All in all, her condition demanded faithful and ceaseless attention and devotion. Both parents, fortunately, gave these to Galen.

The other two children, although now normal and healthy, also presented health problems during their early years. Some were quite severe, particularly Colin's, who at one time was also suspected of being a cystic fibrosis child. It turned out that he was not.

Plaintiff has also been ill on several occasions during her married life, although she, too, appears now to be of good health. Defendant's health as far as the record shows has always been good.

Most of the care of the children fell to the mother, as defendant's work required him to be away much of the time. When he was home, he was attentive to the children and is characterized by plaintiff as being an exceptional father. Throughout her testimony appear such statements as, "He certainly is a very good father and enjoys the children."; "He is particularly outstanding with the two older children."; "No matter how he feels about me I know he will always be kind to the children."; "I know he loves his children very dearly. I can't deny that at all and I will say again he is a marvelous father, but [as to his

having] the custody of the children I find I couldn't take it very seriously."

There is no doubt the care of these children presented a far different problem than that which confronts most young parents. There is no doubt either that both have a real and abiding love for the children and have done their utmost to provide a normal home life under extremely difficult circumstances. The only trouble is that somehow in doing so they lost all love for each other. Instead of drawing them together, this unfortunate situation drove them farther and farther apart. Much of the record is devoted to testimony dealing with the care of the children, particularly Galen. Aside from the two principals, this evidence (except for plaintiff's sister) came almost entirely from neighbors and friends. There is some testimony from doctors and from a clinical psychologist, but it is of little significance in determining who should have custody. Some of the testimony was based on such minimal information that it is virtually meaningless. Much of it was simply neighborhood gossip upon which we hesitate to place great credence. In the last analysis, we must base our decision principally upon the testimony of plaintiff and defendant.

One practical circumstance to which we must give serious consideration is the fact that the children have now been with defendant for more than two years. Plaintiff did not ask for a stay order pending this appeal, nor is there any show of diligence in bringing the matter up for final disposition. The trial court's decree was entered in July 1970. In oral argument counsel advised us both parties have moved from the state. Plaintiff now lives in Colorado, defendant in Milwaukee. Plaintiff has remarried. We do not know the defendant's present marital status.

Galen is now almost ten years old, the age at which half of those so afflicted die. The other children have become established in their new surroundings under the custody of their father.

We again face the difficult and frustrating task of deciding custody according to the best interests of the children (Rule 344(f), 15, Rules of Civil Procedure) under circumstances which no longer exist and conditions which have long since changed.

We remarked on this in Raabe v. Raabe, 191 N.W.2d 551, 553 (Iowa 1971) as follows:

"We find no cogent reasons to disturb Michael's life again by removing him from his mother's home where he has resided for more than two years."

In Eddards v. Suhr, 193 N.W.2d 113, 117 (Iowa 1971) we reiterated that "the status of children should be quickly fixed and, thereafter, little disturbed." And in Maikos v. Maikos, 260 Iowa 382, 392, 147 N.W.2d 879, 885 (1967) we referred to the length of time children had been away from the mother's home as our most "perplexing problem" in deciding custody.

These cases are not cited for any factual similarity to the present controversy, but only to show our concern for repeatedly uprooting children from an already established environment.

Plaintiff leans heavily on the so-called assumption that the interests of small children are better served by awarding their custody to the mother. As pointed out in Raabe v. Raabe, supra, 191 N.W.2d 553, this is more properly an inference rather than a "fixed presumption."

While we still pay some homage to this principle, it must be conceded our recent cases have diluted its strength.

In Raabe v. Raabe, supra, 191 N.W.2d 553, we said:

"We have recognized there is no hard and fast rule as to which parent or other person should be awarded child's custody, and each case should be decided on its own facts. Kayser v. Kayser, 164 N.W.2d 95 (Iowa 1969). We have also said that in all cases motherhood is a

factor to be given weight in deciding questions of child custody. \* \* \*"

In Jones v. Jones, 175 N.W.2d 389, 391 (Iowa 1970), we put it this way:

"[T]hough it be assumed that the best interest of younger children is served by placing him in a mother's care, that is but an inference which yields to evidence tending to show otherwise."

In Harwell v. Harwell, 253 Iowa 413, 418, 112 N.W.2d 868, 872 (1962), we said the presumption is not strong and yields readily to other considerations.

Cramer v. Cramer, 185 N.W.2d 787, 790 (Iowa 1971), describes the presumption as "admittedly not strong, but still extant."

Forsyth v. Forsyth, 172 N.W.2d 111, 114 (Iowa 1969), says this inference "readily yields to evidence tending to show otherwise."

After all is said and done and after everything else is considered, we must always return to the basic tenet which overrides all else—the best interests of the children.

Here we have no doubt the children would receive proper care from either parent. The record—even though it descends at times to carping about minor complaints which inevitably become magnified and exaggerated in a custody contest—reflects without serious dispute that both mother and father are proper custodians for their children.

However, under the whole record and considering the long-range interests of the children—including the substantial financial burden of Galen's care—we conclude custody should go to the defendant.

We have already expressed dissatisfaction at the time lag which makes custody determination by this court difficult. Here, without attempting to attach blame for the delay, the interval has been unreasonably long. As previously pointed out, plaintiff did not ask for a stay order; she did not seek to have her case accelerated; she did not even file the record and brief within the time fixed by our rules. All the while the children were establishing a new life.

We earnestly exhort those who would upset the custodial provisions of a decree to use the utmost diligence in bringing the matter to a swift conclusion. One who expects to argue a change is imperative for the welfare of the children does nothing to enhance one's cause by allowing months or years to slip by without serious effort to expedite the appeal. In close cases—and most of them are—long delay may well tip the scales against uprooting the children a second time.

We refuse to upset the apparently satisfactory situation now existing for one which is uncertain and hazardous. We therefore affirm the provision in the decree which awards custody to defendant.

VIII. We affirm the trial court's decree on plaintiff's appeal except as modified herein and we affirm it outright on defendant's appeal.

As directed in Division VI we also order defendant to pay $1500 toward plaintiff's attorney fees on this appeal. Costs are assessed to defendant.

Modified and affirmed on plaintiff's appeal; affirmed on defendant's cross-appeal.