In re the MARRIAGE OF Diane M. BLESS-
ING and Harold D. Blessing.

Upon the Petition of Diane M. BLESSING,
Appellant,

and Concerning Harold D. BLESSING,
Appellee.

No. 55748.

Supreme Court of Iowa.

July 31, 1974.

Traeger & Koempel, West Union, for appellant.

Donohue Law Office, West Union, for appellee.

Heard before MOORE, C. J., and Le-GRAND, REES, UHLENHOPP and Mc-CORMICK, JJ.

UHLENHOPP, Justice.

This is a perplexing child-custody controversy in a marriage dissolution case. The proceedings are complicated and the evidence is voluminous. We will set out only as much as is necessary to an understanding of the issues.

Petitioner Diane M. Blessing (now Medberry) is the only child of Merlin and LaFonda Meyer, who appear to be upstanding people. Diane was reared in a gentle atmosphere. While in her late teens, she dated one Hall and also respondent Harold D. Blessing. Hall was convicted of a felony, and Diane married him in jail while he was awaiting transfer to the reformatory. On January 15, 1961, while Hall was in the reformatory, Diane gave birth to a son, Blaine. She subsequently obtained an annulment of that marriage.

On September 29, 1961, Harold D. Blessing and Diane were married. Harold later adopted Blaine. Harold and Diane have two daughters, Deena, born May 18, 1964, and Karma, born October 31, 1965. The family lived in West Union, Iowa.

Harold is a registered land surveyor. He worked regularly throughout the marriage and presently earns about $13,000 a year. He is course, loud, domineering, and vengeful. He appears, however, to have been a faithful husband sexually, with one possible exception which the evidence discloses. On that occasion, Diane was working at night at a county home. She came home in the morning to find Harold in one bed and a woman in another bed clad in a sweater, pantyhose, and girdle. Harold testified that the woman insisted on coming home with him from a tavern and that he did not have sexual relations with her, but the circumstances are certainly suggestive.

On at least one occasion Harold inflicted substantial physical violence upon Diane by pulling her hair, stepping on her bare feet so that they were later black and blue, pouring pop on her, and tearing the telephone loose so that she could not call the police.

Harold is an inveterate camper. During the camping season he regularly took the family on camping trips, a practice he continues with the children. He has good health.

Just how the children feel about Harold is a question. They evidently have some fear of him, which may come from his loud and coarse ways or perhaps from his strictness. The two girls expressed a desire to live with their mother, but Blaine stated he wished to live with both parents.

Whether genuine affection ever existed between Harold and Diane is also questionable. Certainly as time went by, Harold became unattractive, perhaps repulsive, to Diane. After Harold and Diane had been married only a few years, Diane be-

gan seeing Hall, who by then was on parole. The evidence does not show how far that relationship progressed.

Diane worked hard during the marriage. She usually held a full-time job outside the home and also took care of the home and family. She has expertise in homemaking and child-care. She encouraged 4–H, Scouts, Sunday School, crafts, and athletics. The children are fond of her. At some point during the marriage she had a hysterectomy, but she too now has good health.

Diane became obsessed about losing her youth. She took diet pills to keep slender. These pills contained some kind of "pep" drug which, especially if she had an alcoholic drink, caused her to use foul language and conduct herself in an immature fashion. She flirted with younger men, to the embarrassment of her companions, and wore dresses of a kind worn by considerably younger women.

During the marriage, Diane demonstrated marked instability as well as unawareness of the effect her conduct had upon the children. She had sexual relationships with several men. She was the aggressor. She seemed driven by a desire to establish the relationships but the affairs apparently involved more than sex from her standpoint; she testified she had feelings of "wanting attention and wanting to be needed." After a time the men would terminate the relationships ("tell her to get lost"), except for one whom she eventually married.

With Harold's boorishness, Diane's instability, and Diane's extramarital adventures, the marriage disintegrated. How the three children survived the storm as well as they did is difficult to understand. Blaine does not appear to have been damaged. He is an outstanding boy, about to become an Eagle Scout at time of trial. He has won many swimming events and is an all-around athlete. He gets average grades. The two girls, who were younger during most of the upheaval, show more

signs of harm. Deena has only one friend, worries because the girls do not care for her, and wets the bed. Karma is more outgoing, but she too is a bed-wetter. Since dissolution of the marriage, Karma has had too little supervision when Harold is not home. Also since the dissolution, Harold has created boisterous and abusive scenes on some of Diane's visitations. This makes the girls cry, increases their bed-wetting, and upsets all three children.

Motivated by assertions by Harold that she was crazy, Diane at one point admitted herself to the Iowa Mental Institute at Independence, where physicians observed her for two weeks. The physicians then released her. We will say more about this matter later.

Eventually Diane commenced the instant dissolution proceeding. She took the children and lived with her parents, for whom Harold harbors bitter antipathy. After preliminary skirmishes, trial of the case began. During trial, the parties negotiated a settlement. The trial court suggested, and we are satisfied from the record, that Harold did not enter into the settlement in good faith, but rather, to improve his position later. In the stipulation, Harold obtained the home and also the care of the children until the end of the school year, when Diane should have the care of them if she had suitable living quarters by then. The district court dissolved the marriage and, pursuant to the stipulation, determined the custody question thus:

> That the children of the parties hereto, namely: Deena, Karma and Blaine be and are hereby awarded jointly to each of the parties, each of them having custody and the children shall be in the care and under the supervision of the respondent until the close of the school year. If at that time petitioner has obtained suitable living quarters then the children shall be under the care and supervision of the petitioner and each party shall have the right to visit the children during said respective times at reasonable

times and places: It is hereby expressly understood that said custody provision shall not be permanent until one year from the date of this Stipulation and that either party may petition the Court to again present testimony concerning the issuance of custody at any time prior to the end of said one year.

Pursuant to the stipulation and decree, Diane turned the children over to Harold, who kept them in his home. Before school was out, Diane obtained a suitable apartment for herself and the children.

On May 22, 1972, before the end of the school year, Harold filed a short "Motion for Hearing." In it he asked the district court "to set down for hearing the matters of custody and visitation as to the children of the parties, all as provided in the decree and further moves the Court to require that he be granted the temporary custody of said children until this matter has been fully determined." No one seems to have received a copy of the motion at the time.

On May 30, 1972, school being out, Diane requested Harold to turn the children over to her. He refused. She filed an affidavit of contempt. The district court set hearing on a rule to show cause for June 26, 1972, and also set trial on Harold's motion regarding custody for August 7, 1972.

At the June 26 hearing on the rule to show cause, the district court limited the inquiry to whether Diane had obtained suitable living quarters. The court found that she had and ordered Harold to turn the children over to her by 4:00 p. m. that day. Harold did not do so but instead took the children to Decorah, Iowa. The sheriff found them there and Diane obtained them.

The next day Harold petitioned this court for a writ of certiorari and obtained an order from this court staying further proceedings in district court.

On the evening of July 5, 1972, Harold appeared at Diane's apartment and asked to take the children to supper, assuring her he would bring them back. Diane let the children go, except Karma who did not wish to do so. Harold did not return the two children he took, Blaine and Deena.

That evening, Diane went to Harold's house to get those two children. Harold refused to let her have them. He and Diane quarreled. She was told that she was crazy, that she was trespassing, and that she should sit in the road. She sat on the curb and wept. Eventually she left. She has not since had custody of Blaine and Deena.

Diane learned about the motion regarding custody which Harold filed in district court. She filed a special appearance to it and also a motion to dismiss it. The district court overruled both her special appearance and motion to dismiss. Later she filed a cross-petition asking custody of the children as well as support and attorney fees.

Regarding the certiorari proceeding in this court, the parties agreed that Blaine and Deena would stay with Harold until the district court determined the custody issue permanently and that Diane would refrain from further pressing her contempt charges. We think the parties understood in connection with their agreement that they would proceed with the custody-visitation trial set for August 7, 1972. Since the parties had settled the certiorari proceeding, this court denied a writ or certiorari on July 31, 1972.

On August 7, 1972, trial began before the present trial court on Harold's motion and Diane's cross-petition. The trial court appointed Mr. Daryl E. Roberts to represent the children and Mr. Roberts participated in the proceedings thenceforth. Diane led off the trial and presented evidence on the whole subject of custody and visitation. Harold cross-examined on the whole subject, but he presented only a small part of his own evidence (witnesses taken out of order).

At one point during Diane's evidence, her attorney raised the question of obtaining a physician as a witness—apparently from the Mental Health Institute. After discussion, the trial court stated he did not care to hear the physician and that, frankly, he had his mind made up. His remarks disclosed that he was influenced by Diane's sexual misconduct, which had then come to light, and by the apparently satisfactory situation of the two children with Harold. He thought Harold should have custody unless Diane presented proof completely at variance to the evidence already admitted.

Diane attempted to prove the doctor's opinion by letters, to which Harold objected as hearsay. Diane then rested.

The trial court thereupon took the case under advisement on the evidence to that point without hearing Harold's main evidence. On August 17, 1972, the court passed decree granting Harold custody of the three children subject to visitation by Diane and awarding Diane $300 as attorney fees and also Mr. Roberts $450 attorney fees. Diane appealed.

Diane's appeal presents the following questions. First, did the district court have jurisdiction to try the custody-visitation issue and was Harold's motion for hearing a sufficient pleading? Second, were the attorney fees awarded Diane adequate? Third, should Harold or should Diane have custody of the children? Fourth, should Diane be allowed appellate-court attorney fees and should Mr. Roberts be allowed additional trial-court fees?

In this court, the parties submitted briefs and argued the case orally. Under our system of practice, we hear and decide the case anew. In re Marriage of Cook, 205 N.W.2d 682 (Iowa). But when the case was submitted, we had only half the evidence. We could not treat the case like an action on commercial paper in which the plaintiff's evidence alone may show he is not entitled to recover. Custody cases involve the best interests of the children, and while a petitioner's evidence may show the petitioner will not be an exemplary custodian, the respondent's evidence may show he will be still worse, or vice versa. We therefore needed the rest of the evidence.

One course was to reverse the case for a new trial. But that would involve delay for the second trial and probably further delay for a second appeal. In the meantime, the status of the children would be uncertain. We therefore exercised our authority under rule 342(e) of the Rules of Civil Procedure. On April 16, 1974, we sent the case back to district court with directions to receive the rest of the evidence and to certify to us the transcript of the additional testimony and the exhibits. We now have these documents in hand and have carefully examined them.

Commencing May 13, 1974, the parties introduced extensive additional evidence on the limited remand. The evidence bolsters the prior proof concerning Diane's instability. Her extramarital escapades were shown at length. They were extensive and reprehensible; we will not dwell on the details. Her puerile conduct about her age was also shown. The additional evidence also brings the situation of the parties up to date. As to Diane, it shows that following the dissolution she delivered Karma into Harold's hands as required by the decree. Diane moved to Waterloo, Iowa, where she lived, unmarried, in a two-bedroom mobile home with a prior paramour, Medberry. They eventually married on May 3, 1974—17 days after our order for limited remand and 10 days before trial began on remand. When Diane had the children for visitation overnight she took them to her Waterloo home, although until the recent marriage, Medberry stayed elsewhere on those occasions. He has no children.

Medberry, six years Diane's junior, has had a spotty career. He had an alcohol

problem and once admitted himself to a Mental Health Institute for treatment. He has been married twice before. He has worked at a number of places for short periods. He was once convicted of possession of a controlled substance.

The evidence shows, however, that Diane and Medberry are trying to improve. They have now been with one employer for a considerable time, each working 40 hours per week at $4.09 per hour. They drink very little. They seem to get along well with each other, and they engage in worthwhile activities with Diane's children during visitations. Diane claims that she has seen the error of her old ways and that she has turned her life around.

The additional evidence shows also that Harold is still unmarried and has had little contact with the opposite sex. His life consists of his job, his children, and his outside activities such as camping with the children, bowling, and practicing weekly with volunteer fire-fighters.

The evidence indicates that Harold too often leaves the children unattended at times when he is not required to be away. The house is not very clean, and a visiting social worker testified that cleaning help for about three hours a week would be beneficial. The children have enough clothing, but the girls' apparel is unattractive and not well laundered. Harold has a rigid regimen of housework for each child, so much that the boy, at least, has difficulty finding time for his various activities.

Harold has consistently been uncooperative about Diane's visitation rights. These rights were indefinite in the original decrees, but by stipulation and supplemental decree they were made definite. Harold has not lived up to the supplemental decree. Frequently Diane must wait past the appointed time, and then she may not get the children at all. Harold appears to be having his revenge.

Harold is completely insensitive to what this trouble over visitation is doing to the children. When Diane drives from Waterloo to West Union at the agreed time, she calls to arrange for taking the children. The children try to take the calls and to act as intermediaries, for they fear that Harold will curse and cause commotion, disturbing everyone involved.

In the light of the original and the additional evidence, we turn to the four problems which the appeal presents.

I. *Jurisdiction and Pleading.* Diane first asserts that notice was not given of Harold's motion for hearing. Hence the district court had no jurisdiction to proceed with that motion and her special appearance should have been sustained.

We find no necessity to decide whether notice of the motion was essential. After Harold sought a writ of certiorari, the parties settled the certiorari proceeding, and Diane did not further press the contempt matter but instead filed a cross-petition seeking custody. We think that in the settlement the parties agreed, impliedly at least, that the district court should decide the custody-visitation matter in the trial which was set to commence August 7, 1972.

Diane is correct that after a special appearance is overruled, a party may plead to the merits and go to trial without waiving error. Rule 66, R.C.P. But we think the parties went a step farther here and understood that the district court should try the custody matter on the merits. The district court has jurisdiction of this class of cases, and the parties could confer jurisdiction of the person by agreement. Morse v. Morse, 247 Iowa 1113, 77 N.W.2d 622; McKim v. Petty, 242 Iowa 599, 45 N. W.2d 157; 20 Am.Jur.2d Courts § 139 at 488–489; 21 C.J.S. Courts § 85 at 133–134. We hold, therefore, that the parties conferred jurisdiction on the district court to

try the custody issue and matters related thereto.

■ By the same token, we need not determine whether Harold's motion for hearing was technically sufficient as a pleading to raise the issue of custody and visitation, when attacked by Diane's motion to dismiss. Both parties understood that custody and visitation should be tried on Harold's motion. In addition, Diane's cross-petition raised those issues fully. See 61 Am.Jur. 2d Pleading § 392 at 786; 71 C.J.S. Pleading § 570 at 1142. We hold, therefore, that Diane's present complaint with reference to the pleadings is likewise untenable.

II. *Diane's Trial-Court Attorney Fees.* Diane asserts that the trial court's allowance of $300 to apply toward her attorney fees for the original trial is inadequate.

The legal services rendered by Diane's attorney up to the time the appeal was first taken are obviously worth considerably more than $300. But the question is, how much of the fee should Harold bear? He earns about $13,000 annually and has some debt, although not much. The situation is unusual, however, for in this case the husband has the children in his custody and not only has all of their financial support but also their personal care. Diane must be earning about $8,000 annually, and her husband, Medberry, earns a like amount. They have no one to support or take care of except themselves.

■ We discussed the matter of attorney fees in the case of In re Marriage of Romig, 207 N.W.2d 780 (Iowa). Under the unusual circumstances of the present case, we think the trial court's allowance of $300 should stand. Diane will herself have to pay her attorney the additional fees for services in the trial court. Any additional amount we would impose on Harold would to some extent be taken from funds useable for the children.

III. *Custody and Visitation.* The heart of the case is the issue of custody and visitation of the children. The trial court awarded Harold custody, and the supplemental decree grants Diane specific rights of visitation. The guiding principle is the welfare of the children. In re Marriage of Bowen, 219 N.W.2d 683 (Iowa). We disapprove the portion of the original decree which left custody uncertain for a year, for reasons expressed in Shipley v. Shipley, 182 N.W.2d 125 (Iowa). But the parties do not challenge that provision.

The trial court was right in keeping the three children together. They are close to each other and get some comfort from one another. The choice of custodian comes down to Harold or Diane; they both have faults, but there is no one in the picture who would be better. Dividing custody between Harold and Diane—each having the children part of the time—would be unwise. That would only add to the disruption.

As a custodian, Diane has pluses and minuses. She is skilled in child-rearing. She can teach the children the arts of homemaking and advance their activities. But she has a streak of instability and immaturity. In the past, at least, she has demonstrated selfishness, placing her own pleasures ahead of the family. Her present husband leaves something to be desired as does the size of the present mobile home. Whether she has in truth turned her life around as she claims, query.

Harold, as a custodian, likewise has strengths and weaknesses. Except for the occasion when he brought home a tavern companion, he appears to be morally upright. He works steadily, produces an income, and supports the children. He endeavors, in his own way, to rear the children properly. Yet he is coarse, vindictive, and insensitive. Most important, he does not seem to realize the damage he is inflicting on the children by his harassment of Diane in connection with visitation.

A choice must be made. The children have been with Harold for a considerable time now. Their roots are in West Union. They are near their maternal grandparents there—if Harold would only give them freer access to the grandparents.

■ The trial court, even without Harold's evidence, thought Harold to be the better choice. We agree that Harold should have custody, although we are concerned about the trouble over visitation. We strongly reprimand Harold for his uncooperative attitude and conduct in connection with visitation. We hope he will come to realize that Diane does have rights under the supplemental decree and that the children have the right to visit Diane. If Harold persists in his uncooperative course, perhaps further contempt proceedings or even modification proceedings may be necessary. But in the present state of the case, we uphold the award of custody to Harold and the supplemental decree regarding visitation. We direct the trial court, however, to add a provision to the decree for supervision of Harold's custody of the children, on such terms and for such period as the trial court in its discretion deems reasonable. In re Marriage of Bowen, 219 N.W.2d 683 (Iowa).

IV. *Additional Fees.* Diane asks an allowance of Harold to apply on her attorney fees for this appeal. In view of the unusual circumstances of this case, we think each party should pay his and her own attorney. Diane is in as good financial position as Harold, when Harold's obligation to support and personally attend the children is considered.

Mr. Roberts asks fees for representing the children in the trial court. For the original trial, the trial court awarded Mr. Roberts $450 of Harold. Harold has not paid the fee, and Mr. Roberts asks that the county be ordered to pay it.

Mr. Roberts also asks that the county be ordered to pay him a fee for representing the children on limited remand, itemizing his services and expenses. His services were helpful; we think they are worth an additional $450, including expenses. The district court did not make an allowance on this application, as the limited remand was only to receive evidence. Instead, the court certified Mr. Roberts' application to us.

The legislature provided in § 598.12, Code 1973:

> The court may appoint an attorney to represent the interest of the minor child or children of the parties. Such attorney shall be empowered to make independent investigations and to cause witnesses to appear and testify before the court on matters pertinent to the interests of the children. The court shall enter an order in favor of such attorney for fees and disbursements, which amount shall be charged against the party responsible for court costs unless the court determines that the party responsible for costs is indigent in which event the fees shall be borne by the county.

■ The question is whether Mr. Roberts' original fee of $450, plus his additional fee in a like amount, are to be paid by the party responsible for court costs or by the county. As to the original $450 fee, the trial court imposed the burden on Harold, as the party responsible for costs, evidently thinking that Harold is not indigent. With Harold's income of $13,000 and his small amount of debt, we hold the trial court was right. Harold must pay the fee, and Mr. Roberts can take appropriate proceedings to collect it.

■ No order has been made, however, as to costs on trial on limited remand and on appeal. We hold such costs should be divided between Harold and Diane, and therefore that each of them must pay half of Mr. Roberts' additional fee of $450 for services on limited remand. We hold again that indigency does not appear; between them, Harold and Diane earn in ex-

cess of $20,000 per year. Mr. Roberts may take proceedings against Harold and Diane to collect this additional fee, each being liable to him for $225 of such fee.

We uphold the decree of the trial court, subject to modification by that court as to supervision of Harold's custody of the children. Costs half to Harold and half to Diane for trial on limited remand and on appeal.

Modified and affirmed.