In re the MARRIAGE OF Claude M. DALLY and Carolyn D. Dally.

Upon the Petition of Claude M. DALLY, Appellant,

and concerning

Carolyn D. DALLY, Appellee.

No. 2–56762.

Supreme Court of Iowa.

Oct. 16, 1974.

McCarville, Bennett, Beisser & Ferguson, Fort Dodge, for appellant.

Price & McGrevey, Fort Dodge, for appellee.

Heard before MOORE, C. J., and REES, UHLENHOPP, HARRIS and McCORMICK, JJ.

UHLENHOPP, Justice.

We are called upon in this appeal to decide, primarily, which parent will be the better custodian of a small child.

Petitioner Claude M. Dally, born January 5, 1950, is the son of Mr. and Mrs. Elsy Dally. The senior Dallys are religious, upstanding people and evidently quite strict in their ways. Claude tends to be strict, authoritarian, and self-centered.

Respondent Carolyn D. Dally, born September 24, 1952, is the daughter of Robert King and Marilyn King Redmond, who were divorced when Carolyn was four. Robert King received custody of Carolyn in the divorce. The record discloses little about Carolyn's parents except that they have both remarried. Carolyn stated that as a teenager she was torn between loyalty to her father and to her mother.

According to Carolyn's father, Carolyn was not difficult to raise until she was in high school. She then visited her mother in

Arizona, and upon her return to Iowa appeared to her father to have changed and become more independent and hard to control. She wanted to leave home. The evidence does not reveal the basic cause of the difficulty.

Claude lived near the Robert King home, and he and Carolyn dated. In September 1969, Claude and Carolyn ran away to South Dakota to get married. But their car broke down and they ran out of money, so they returned home unmarried.

Carolyn then went to her mother in Arizona. Claude followed, but as he was in the draft he could not find employment. In October 1969, soon after he arrived in Arizona, he enlisted in the army.

On December 30, 1969, Claude, 19, and Carolyn, 17, married. Thereafter they lived in Massachusetts about six months. In July 1970, Claude left for Viet Nam for a year. Carolyn went to Fort Dodge, where she lived in a small house. On November 24, 1970, Carolyn gave birth to the parties' daughter, Carla.

As usual in such cases, the record contains evidence about the parties' good and bad conduct. During Claude's year in Viet Nam, Carolyn attended some parties in mixed company. She may have had an affair with one Uliche, although the evidence does not disclose the extent of the relationship. Claude admitted that he was guilty of indiscretions while he was in Viet Nam.

Claude returned from Viet Nam in July 1971, and the family of three thereafter lived on an army base in Maryland until shortly before Claude received his discharge. During that time Claude took little interest in Carla; she seemed to bother and annoy him. Also, the marriage began to deteriorate. Carolyn arose late in the morning and retired late at night after watching television. Claude was dissatisfied with Carolyn's habits, which were probably considerably different from his mother's. The parties quarreled and used coarse language, and they shouted at Carla.

The basic relationship between Carolyn and Carla, however, was always close and affectionate. Carla is precocious but high strung.

In preparation for Claude's army discharge, Carolyn and Carla went to Wisconsin to the family of Robert Dally, Claude's brother. Claude planned to obtain work in that area. Soon afterward, Claude joined her there, having received his discharge on October 16, 1972. He obtained work as an automobile mechanic in Red Wing, Minnesota, but could not find housing in that city. He rented a farmhouse about 35 miles distant in Wisconsin and commuted to work daily in the parties' car. The parties were then 22 and 20 years old respectively, and Carla was two.

Carolyn and Carla were thus left in a rural area without transportation, in the winter, among strangers. Claude took them to town once a week to buy groceries. Practically the only contact Carolyn had with the outside world was through television; the parties had a black and white set which a relative had given them. Carolyn was lonely and Claude seemed to be oblivious to her situation. He took little interest in her and the child.

The marriage continued to deteriorate. Carolyn became friendly with a telephone repairman who came to the house. How far that relationship progressed the evidence does not show.

Eventually Carolyn was somehow able to get to a psychiatrist in Rochester, Minnesota, to see what could be done about improving the marriage. The psychiatrist wanted Claude also to see him, but Claude would not do so. Carolyn then consulted a lawyer for advice. He recommended that she and Claude go to the local Lutheran counseling service, which was free, but Claude would not go.

Carolyn became desperate about the poor relationship between Claude and her and about the housing situation. On the evening of January 29, 1973, after Claude was

asleep, Carolyn took the parties' car and drove to town. She found the telephone man in a tavern and sat and talked with him until a late hour. She then left with him in the car—she says to ride around. She got home about 3:30 a. m.

In the meantime, Claude woke up, found Carolyn gone, and telephoned his brother, who advised that perhaps Carolyn needed "a good beatin'." When Carolyn got home, Claude struck her in the face, wrestled her to the floor, sat on her arms with his knees, pounded her head and arms, and generally administered a thorough beating. He then took Carla and drove to his brother's home; the next day he drove with Carla to his parents' home in Fort Dodge. He has lived there since then.

Also the next day, Carolyn, having no money or car, walked and hitch-hiked to town and obtained food stamps. She eventually obtained transportation to Fort Dodge. Thereafter she lived with a relative in Rockwell City, Iowa.

Claude promptly commenced the instant proceeding, in which he asked that the marriage be dissolved and that he be granted custody of the child. Carolyn also asked custody of Carla, as well as support. The district court appointed an attorney to represent the child. After investigation, that attorney joined forces with Carolyn on the custody issue and presented evidence in her favor.

We cannot recite all of the evidence; it is too voluminous. Among other things, the parties each saw a Fort Dodge psychiatrist. He reported that Carolyn desires to please others and avoid criticism, she has considerable warmth and ability to feel for other people, she has difficulty arriving at definite opinions, and "she would provide a warm, accepting home, but her actions and behavior might be quite likely to change from time to time depending on influence from other people." He reported also that Claude grew up in a stable home with some feelings of masculine superiority and strong ideas of right and wrong, Claude has a rather rigid compulsive personality with firm expectations of people but short patience, and "he would tend to establish a stable home with rather firm, perhaps rigid expectations of children and others in the home with him."

Between the time Claude left Wisconsin on January 30, 1973, and the trial which began on August 27, 1973, Carla was in the home of the senior Dallys, where Claude's mother largely attended her needs. Claude's mother was 53 at time of trial, and his father, who has charge of building maintenance at a Fort Dodge school, was 58. Claude's mother took good care of Carla. Claude regularly attended church services with the child.

Also at time of trial, Claude was working part time and was also taking an 11-month course in automotive mechanics at the local community college under the G.I. bill. That training will improve his position in the auto mechanics field and may lead into other forms of mechanics. The parties had indebtedness at that time of something under $2200, which Claude was slowly paying off as he was able.

After trial, the trial court promptly passed decree dissolving the marriage, awarding Carolyn custody of the child and granting Claude reasonable visitation rights, giving Carolyn the household goods, requiring Claude to pay the parties' indebtedness, and obligating Claude to pay Carolyn $15 weekly as alimony as long as she is single and $35 weekly as child support until Carla becomes 18, marries, or is emancipated.

Claude appealed. Carolyn has had custody of Carla during the pendency of the appeal.

In this court, Claude asserts that he should have custody of Carla and that, in any event, the alimony and child-support payments should be reduced.

I. *Custody.* The governing principle in child-custody cases is the best interest of the child. Raabe v. Raabe, 191 N.W.2d

551 (Iowa). The problem in these close cases lies in the application of the principle to the facts.

The evidence indicates that Claude, with the help of his mother, Carla's grandmother, would probably rear Carla quite well. The age problem enters into the picture, however, as to the grandmother. She is yet another generation removed from the child. When Carla is a senior in high school, the grandmother will be about 67. Of course, Claude may remarry before Carla grows up.

On the other hand, Carolyn had Carla with her some 26 months from birth until Claude took the child. Strong ties exist between Carolyn and the child. Were it not for two factors, we would have no hesitancy in granting Carolyn custody, notwithstanding that she is not a model in child care or homemaking.

One factor is Carolyn's apparent indecisiveness and lack of convictions. Perhaps this is due in part to immaturity. She may develop strength with more age.

The other factor of course is infidelity— Carolyn's conduct with the opposite sex. That problem has arisen in several recent dissolution cases. In re Marriage of Blessing, 220 N.W.2d 599 (Iowa); Jacobs v. Jacobs, 216 N.W.2d 133 (Iowa); In re Marriage of Callahan, 214 N.W.2d 133 (Iowa); In re Marriage of Dawson, 214 N.W.2d 131 (Iowa); In re Marriage of Forest, 201 N.W.2d 728 (Iowa). The problem relates to the training, or lack of training, that the mother will give the child and the example, or lack of example, that the mother will set for the child. We realize that Carolyn married at a very early age, that she did not have the dating with boys that many girls have, that her husband was away at war, that later she was left in a lonely rural setting far from old friends and familiar places, and that the evidence is not strong as to how far her relationships with other men actually went. But if Carolyn sets a bad example or fails to rear Carla properly, these alleged excuses will not help the situation.

■ The custody question is close. The trial court saw and heard the parties, and concluded that Carolyn should have custody. The independent counsel for the child also presented evidence to that effect. We conclude—although with some hesitation— that the court's decree on custody should stand.

■ II. *Alimony and Child Support.* As to the amount of alimony and child support, we do not consider the issue of constitutionality which Claude raises, for that issue was not raised in the trial court. In re Marriage of Cook, 205 N.W.2d 682 (Iowa); In re Marriage of Tjaden, 199 N.W.2d 475 (Iowa).

■ This court has listed factors to consider on alimony and child support. Schantz v. Schantz, 163 N.W.2d 398 (Iowa); Norenberg v. Norenberg, 168 N.W.2d 794 (Iowa); In re Marriage of Williams, 199 N.W.2d 339 (Iowa). Since Carolyn will have custody, she will need the household goods as the trial court held. She has no funds to pay off the parties' debts, and the court also properly imposed this burden on Claude.

■ As to the periodic payments of alimony and support, the question comes down to Carolyn's need and Claude's ability to pay. Carolyn has no training for a job. Claude has skill and training. He has very good earning potential. He can earn considerably more than when he was temporarily attending community college. His army fitness report states that he is a very good worker. The weekly alimony of $15 and child support of $35 amount to about $220 monthly. Certainly in these high times that amount is not excessive. We believe Claude has no just ground for complaint on this score.

We do think, however, that the alimony should cease when the child support ceases, or when Carolyn remarries, or when Claude (or Carolyn) dies, whichever first occurs. We modify the decree accordingly, but hold the decree otherwise to be equitable.

Claude's motion to strike portions of Carolyn's brief requires no ruling, as we give no consideration to the material in question.

Modified and affirmed.