In re the MARRIAGE OF Catherine BOW-
EN and Lloyd C. Bowen, Jr.

Upon the Petition of Catherine BOWEN,
Appellee,

and Concerning Lloyd C. BOWEN, Jr.,
Appellant.

No. 2–56745.

Supreme Court of Iowa.

June 26, 1974.

Lloyd C. Bowen, Jr., pro se.

Alanson K. Elgar, Mount Pleasant, for the children.

Submitted to MOORE, C. J., and MA-SON, REES, REYNOLDSON and Mc-CORMICK, JJ.

McCORMICK, Justice.

This appeal involves a parental dispute over child custody. The marriage of the parties, petitioner Catherine Bowen, now Catherine Moore (Catherine), and respondent Lloyd C. Bowen, Jr. (Clay), was dissolved February 14, 1972. Catherine is now 39; Clay is 41. Temporary custody of their two children, Mary, now 11, and Lloyd C. III (Clay III), now 10, was awarded to the Henry County Department of Social Services with directions for placement with the mother on a six month trial basis. On September 14, 1973, after further hearing, a supplemental decree was entered awarding custody of the children to the mother. The father appealed. We reverse and remand.

The parties met about 1960 in Houston, Texas. Clay resided there. Catherine moved there from Arkansas with her four children after leaving her first husband.

Those children are Richard, Jim, Anne, and Christopher, now ages 21, 19, 18, and 14. During the first few months of their acquaintanceship Catherine represented herself to Clay as a widow. Then she revealed her true status. Subsequently she divorced her first husband and in November 1961 married Clay.

Mary was born December 9, 1962, and Clay III was born February 16, 1964. The family moved to Mount Pleasant in 1965. Clay has worked for Mason & Hanger-Silas Mason Co., Inc., as an engineer at the Iowa Army Ammunition Plant in Burlington since 1964. Catherine worked for three years prior to the dissolution, two at the ammunition plant and one as assistant to a Mount Pleasant accountant.

Serious problems occurred in the marriage as early as 1964. The parties argued frequently.

Clay testified he learned in March 1967 that Catherine was involved with another man. Later she started playing in a band with several teenage males. She spent several evenings each week practicing with them. On one occasion, when Clay was out of town, one of them, Danny Hull, about 16 or 17, stayed overnight in the home. Although Clay did not think she was guilty of sexual misconduct with the boy, he asserted her attitude toward discipline of the children suddenly changed. Whereas she previously had been quite strict, Clay said she became very permissive, explaining to him she realized from her association with Danny that her own teenagers were no longer children. According to Clay she began to dress and behave as a teenager herself and turned over many household responsibilities to her daughter Anne. Danny Hull and his brother Robert, 19, were frequently her guests in the home.

Catherine testified there was "very little intimacy" between Danny and her except "such that occurs on the bandstand, or a little kiss or something like this * * *." She acknowledged adulterous involvement with Robert Hull, but, even though he spent many evenings in the home, she did not think the children were aware of it. However, Clay testified he caught Catherine's teenage sons in the upstairs bath one night listening at a vent to the whispering of Catherine and Robert who were together in the living room. One of the boys asked Clay why he put up with her conduct.

On another occasion Clay got up at night, noticed a candle flickering in the living room, and discovered Catherine and Robert there on the couch partially undressed. These and similar incidents occurred while all six children were in the home. Catherine also admitted she spent a night with Robert in an Illinois motel.

She testified she experimented with marijuana in the home with another friend, Paul Whipple, age 18, but did not like it.

The parties were often at odds over Catherine's conduct, discipline of the children, and other issues. Rather than prolong an argument, Clay would withdraw to his room. Catherine moved to a separate bedroom in early summer 1970.

Mary and Clay III lived in the home with the children of Catherine's first marriage and regarded them as siblings. Richard left home while still in high school and drifted around until entering military service. Jim ran away at 16 because he was upset with the home environment. Anne and Christopher were still in the home at the time of the November 1971 dissolution hearing. Catherine brought Anne, then 16, to the hearing. She testified Anne was a confidant as well as daughter. She admitted she volunteered advice to Anne about contraception one day during an outing in a park in the presence of Anne's first boy friend. She acknowledged she depended on Anne to prepare the evening meal and take much of the responsibility for care of the younger children.

Clay testified Catherine had frequent outbursts of temper and was abusive of the children at times. He related an incident when he said he had to restrain her from beating Anne with a broomstick when Anne was an hour late getting home from a church project.

Mary was an above average student. She was upset by parental arguments but seemed to sympathize with her father. Clay III was doing average school work, below his ability, was hyperactive, and reacted to parental conflict by building a dream world of his own.

The parties visited several marriage counselors and each received some psychiatric therapy prior to the dissolution. Clay III was under treatment by a psychologist during the school year preceding the dissolution.

After consuming a non-lethal overdose of sleeping pills in February 1971, Clay was taken to the hospital and on advice of his psychiatrist did not return to the home. Catherine started the dissolution action in March.

During the period of separation Catherine often saw John Moore, a younger man but not a teenager. He was frequently an overnight guest in the home, and Catherine admitted a sexual relationship with him. She and the children went on camping trips with him. Clay refused Catherine's request that he pay half the cost of a tent for these trips.

Clay saw his children almost daily during the separation and had them with him almost every weekend. He took active part in their school activities. Catherine asserted he had not shown as much interest in them before the separation.

Catherine testified she intended to keep her job with the accountant and remain in Mount Pleasant. She described her relationship with John Moore as a "low level" romance. She said she last saw Moore in October 1971, thought he lived in Fairfield, but no longer had any relationship with him, and had no plan to marry anyone. She expressed a desire to have custody of the children because she loved them and thought they wanted to be with her but said she would be willing for Clay to have them if she could not.

Three witnesses were called by Clay in support of his request for custody. They were Lena J. Masden and Myrna Leu, family friends, and Q. Gerald Roseberry, minister of the family church. Mrs. Masden met the Bowens in 1965. She and her husband shared their interest in music. She considered herself a close friend of the family and often babysat with the children. They called her grandma. She described a change in Catherine and thought she put her own interests ahead of the best interests of the children. She thought Clay should have custody because he would put the children's interests ahead of his own, provide a religious home, and exercise a firm hand in raising them.

Mrs. Leu was better acquainted with Clay than with Catherine. Clay and her husband got together frequently to play musical instruments, and Clay often brought his children with him. She believed Clay should be awarded their custody because he would provide them a stable home.

Pastor Roseberry had counselled with the parties. He thought Catherine's discipline was erratic and less constructive than Clay's, but he was concerned about Clay's moods of depression. He gave what he called a qualified opinion that Clay should have custody. He thought the children related well to their father, and Clay would do everything he could to provide them a proper environment.

The attorney for the children offered the testimony of Harry D. Harper, Jr., a psychiatrist who had counselled with the parties, treated Clay, and examined Clay III. He described Catherine as a person who has difficulty in controlling her impulses, is sensitive to rejection, and who responds to frustration in inappropriate

ways. He said she attempts to hurt those whom she blames for her frustrations and becomes quite irritable, aggressive and impulsive.

He described Clay as overly self-critical and very intense, with a tendency to scrutinize matters beyond the point of reasonableness. He saw him as depressed and pessimistic, in part because of his inability to control the conduct of others.

Clay III was described as hyperactive, bright and curious, but with little behavior control.

Dr. Harper testified Clay showed more stability than Catherine, more persistence, and more willingness to take advice. He believed Catherine was not able to handle stress in a mature manner. Yet, because Clay did not function as well as a parent should, he suggested the children be placed outside the home until one of the parents demonstrated sufficient stability to receive their custody.

Clay testified he loved the children, feared for their welfare if Catherine was given custody, and would care for them with the assistance of a housekeeper if he obtained custody.

In its decree of February 14, 1972, the court dissolved the marriage, divided the modest property of the parties, gave temporary custody of the children to the Henry County Department of Social Services with directions they be placed with their mother for six months, ordered Clay to pay debts of the parties and child support, and provided for eventual further hearing on the issue of final award of custody. Trial court did not believe either parent was then a suitable custodian but expressed three reasons the children should be placed temporarily with the mother. They were the inference a mother is ordinarily best suited to care for children of tender years, the belief it would be less upsetting emotionally for the children to remain in the home where they were living, and the fact they would be in the home with Anne who was a stabilizing and helpful influence.

Subsequent hearing was held July 19, 1973. The intervening period had been stormy and eventful. It turned out Catherine's relationship with John Moore had not ended. She continued to see him. The prospect of her remarriage upset Mary and Clay III. She quit her job with the accountant and went to work for the city as a secretary. She planned to marry Moore. He had held four jobs in the last five years and was being trained in grocery store management. He took a job in Chillicothe, Illinois.

On January 30, 1973, Anne ran away from Catherine's home. She first went to Clay and, upon his advice, went the next day to the department of social services. She said Catherine had attacked her with a board during an argument. She reported her mother had an uncontrollable temper and kept the home in turmoil. Anne was quite bitter. She believed Catherine was unreasonable at times, put too much responsibility on her, and she did not like John Moore. She was placed in foster care so she could finish high school. She refused to see Catherine.

Clay seemed obsessed with his desire for custody of the children. There is evidence he kept close watch on Catherine and the department of social services, with whose supervision he was dissatisfied. He took the children to Texas on one occasion in 1972 for three weeks, and Catherine had to come after them. Clay's excuse for not returning them was a subterfuge.

For six weeks from mid-April through May 1973 Catherine denied him visitation for fear the children would reveal her marriage plans to him.

Sandra K. Shaull, a county social worker, interviewed Mary and Clay III in March 1973. At that time Mary was not happy about the impending marriage but Clay III did not seem to object. Catherine

reported receiving threatening letters and phone calls. She and Moore were married May 13 and moved to Chillicothe when school was out. She quit her job in Mount Pleasant and did not seek employment in Illinois.

At the July 19, 1973, hearing Miss Shaull testified both children had recently told her they wanted to live with their father. She said this had always been Mary's desire. She also reported Clay's mother was living with him in Mount Pleasant. Clay testified his mother was planning to reside permanently with him. He said she was 57, in good health, and able and willing to help care for the children. He wanted to purchase Catherine's one-half interest in their former home and move there with the children.

The social worker was requested to prepare a supplemental report which the parties agreed could be received and considered by the court in reaching its final custody decision. This report was furnished August 23, 1973. In it Miss Shaull repeated in detail the tumultuous events of the prior eight months and discussed the then-current situation in each household. She said Mary and Clay III were unhappy in Chillicothe. They told her there was considerable fighting in the household, they did not like Moore, they did not like the town, and they wanted to live with their father and grandmother. Clay took the children home with him every other weekend.

The report described the grandmother as divorced from her fourth husband but established in Mount Pleasant with an intent to remain there to maintain a home for Clay and the children. She was said to believe in firm and consistent discipline. Miss Shaull wrote, "[S]he shows a great deal of patience and understanding in dealing with the children. The children respect her and have a great deal of affection for her."

Trial court entered its supplemental decree on September 14 awarding custody of the children to Catherine. The court grounded its decision on findings the children seemed to be making a satisfactory adjustment, Clay's emotional problems had not ended, the children were too young to have their preference accorded much weight, it was too early to tell if Catherine's remarriage would work out, and the court did not have an opportunity to see or question Clay's mother.

This appeal by Clay followed. In addition to the usual problems attendant to a difficult custody case, we have an appeal in which the father represents himself and the mother has not participated at all.

Parts of Clay's brief are devoted to criticism of trial court's findings relating to his emotional state and the way this case was handled by the court, department of social services, and others involved. This criticism only confirms Dr. Harper's statement that Clay tends to scrutinize matters to the point of being unreasonable. The court's observations as to Clay's emotional problems are fully supported by the record, and although we disagree with the result, we have no criticism of the procedure employed by those involved in the frustrating task of attempting to find a satisfactory solution to the perplexing custody problem in this case.

Two relevant questions are presented. They are: (1) should we abandon the inference that the best interests of children of tender years are better served by awarding custody to their mother and (2) should custody have been awarded to the father in this case?

We must decide these questions in the context of several well-settled principles. Our review is de novo. Although we are not bound by trial court findings we give them weight. The status of children should be quickly fixed and, thereafter, little disturbed. Siblings should not usually be separated. No hard and fast rule governs which parent should have custody. It is not a matter of reward or punishment. The issue is ultimately decided by deter-

mining under the whole record which parent can minister more effectively to the long-range best interests of the children. See Jacobs v. Jacobs, 216 N.W.2d 312 (Iowa 1974); In re Marriage of Callahan, 214 N.W.2d 133 (Iowa 1974); In re Marriage of Dawson, 214 N.W.2d 131 (Iowa 1974); Carey v. Carey, 211 N.W.2d 342 (Iowa 1973); In re Marriage of Jennerjohn, 203 N.W.2d 237 (Iowa 1972); Miller v. Miller, 202 N.W.2d 105 (Iowa 1972).

Factors to be considered include the characteristics and needs of the children, the environments involved, the characteristics of those seeking custody, their respective abilities to provide for the material, social, moral and emotional needs of the children, available alternatives, and whatever other relevant matters the evidence in a particular case may disclose. Moral misconduct by a parent is one factor affecting that parent's fitness to have custody. In re Marriage of Dawson, supra, 214 N.W.2d at 132.

It is wrong to treat a parental custody decision as merely an adjudication of parental rights. Children are innocent victims of marital bankruptcy. Their welfare is paramount. Custodial claims of contending parents are subservient to the rights of their children to grow to maturity in a proper environment.

I. *The inference.* The father challenges the inference, relied upon by trial court, that the best interests of younger children are served by placing them in their mother's custody. This inference is partly based on the assumption a mother keeps the home, performs household duties, and will have more time to devote to the children and their welfare. When the evidence in a case shows such assumption is not justified we have held the inference readily yields. Forsyth v. Forsyth, 172 N. W.2d 111, 114 (Iowa 1969).

Modern redefinition and adjustment of traditional parental roles has greatly diluted the strength of the inference. Carey v. Carey, supra; In re Marriage of Jennerjohn, supra; Miller v. Miller, supra, 202 N.W.2d at 112–113, and citations.

The constitutionality of the inference was attacked in the Carey case, but, because the trial court decree was not shown to be based on it, the issue was not resolved. 211 N.W.2d at 344–345. At least one court has concluded the inference unconstitutionally denies fathers equal protection of the laws under Amendment 14, United States Constitution. State ex rel. Watts v. Watts, 350 N.Y.S.2d 285 (N.Y.C. Fam.Ct.1973). This result was reached after finding the inference is based on sex, a suspect classification purportedly subject to strict judicial scrutiny. See Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

Clay attacks both the constitutionality and the wisdom of the inference. We find it unnecessary to decide the constitutional issue because we hold the inference is no longer wise. It is simply not justified as an *a priori* principle. It tends to obscure the basic tenet in custody cases which overrides all others, the best interests of the children. The real issue is not the sex of the parent but which parent will do better in raising the children. Resolution of that issue depends upon what the evidence actually reveals in each case, not upon what someone predicts it will show in many cases. If past decisions teach us anything, "it is that each case must be decided on its own peculiar facts." In re Marriage of Dawson, supra, 214 N.W.2d at 132.

We do not think either parent should have a greater burden than the other in attempting to obtain custody in a dissolution proceeding. It is neither necessary nor useful to infer in advance that the best interests of young children will be better served if their custody is awarded to their mothers instead of their fathers. We previously emphasized the weakness of the inference; we now abandon it.

II. *The custody award in this case.* At the time of the initial award of temporary custody of the children to the county department of social services for placement with the mother, trial court relied upon three factors, the inference discussed in Division I, a desire to keep the children in the home where they had been living, and the stabilizing influence of their half-sister Anne. It is also obvious trial court accepted Catherine's representation that she would mend her ways and put the children's interests ahead of her own.

By the time of the second hearing 19 months later the projected image of a stable environment for the children had been shattered. Catherine continued to see and later married the paramour with whom she testified she no longer had any relationship. Her fits of temper and immature dependence drove Anne from the home in the pattern followed by her two older sons at about the same age. She moved the children from their home in Mount Pleasant to Illinois. The children's lives were put in turmoil. They complained of conditions in the mother's home and asked that they be allowed to live with their father.

What Catherine has done speaks with greater force of her qualities as a parent than what she has said she will do. She has demonstrated she does not put the best interests of the children ahead of her own self interest. Leaving the children in her custody would be hazardous and possibly disastrous. See McNamara v. McNamara, 181 N.W.2d 206, 209–210 (Iowa 1970).

Trial court observed that none of its alternatives for custody was completely satisfactory. We agree.

Clay suffered from depression during the time the marriage was breaking down. Perhaps to some extent this can be attributed to damage to his ego and self-esteem produced by Catherine's conduct. We do not know whether his erratic behavior since then demonstrates misguided concern for the best interests of the children or simply concern for his own self-image. In any event he has not always acted responsibly or maturely.

The determinative factor is that throughout these difficulties he has maintained what appears to be a wholesome and constructive relationship with the children. His past conduct as a parent speaks well of his ability and willingness to put the children's best interests ahead of his own. He has been a loving father. He was a faithful husband. He has held a responsible job for many years. He has a satisfactory plan to provide a stable and loving home for the children. The prospects for the children are better with him than with their mother.

■ Although not controlling nor entitled to much weight, it is relevant that the children have stated a preference to be in their father's custody. Jones v. Jones, 175 N.W.2d 389, 391 (Iowa 1970). We are disappointed that children so young have been asked so often to express themselves on the subject, but this preference on their part coupled with close association with their father during the pendency of this case provides some assurance their lives will not be unduly disturbed now by an award of custody to him.

■ We hold custody of the children should have been awarded to their father. The case is reversed and remanded for entry of a modified decree awarding custody of the children to Clay subject to reasonable visitation by Catherine, elimination of the decretal provision relating to child support, and fixing the fee of the attorney for the children on appeal. Such fee and all appeal costs are taxed to respondent Lloyd C. Bowen, Jr. We also ask trial court to include a provision in the modified decree for supervision by the court of Clay's custody of the children on such terms and for such period as to the court in its discretion seems reasonable.

Reversed and remanded.