**IN THE COURT OF APPEALS OF IOWA**

No. 13-1351
Filed May 29, 2014

IN RE THE MARRIAGE OF RYAN T. GRAY
AND ROBIN R. GRAY

Upon the Petition of
**RYAN T. GRAY,**
        Petitioner-Appellee,

**And Concerning**
**ROBIN R. GRAY,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Woodbury County, Duane E.

Hoffmeyer, Judge.

        A wife appeals the physical care provision of the district court's dissolution

decree.  Both parties seek appellate attorney fees.  **AFFIRMED AS MODIFIED**

**AND REMANDED.**

        Andrew B. Howie of Hudson, Mallaney, Shindler & Anderson, P.C., West

Des Moines, for appellant.

        Molly Vakulskas Joly of Vakulskas Law Firm, P.C., Sioux City, for

appellee.

        Heard by Danilson, C.J., and Potterfield and McDonald, JJ.

**DANILSON, C.J.**

Robin Gray appeals the physical care determination, the award of the child dependency exemption, and the attorney fee provisions of the district court's dissolution decree. Robin maintains the district court was wrong to award physical care of the parties' minor child (LEG) to Ryan Gray and to award Ryan the right to claim LEG as a dependent on his taxes each year. She also maintains the district court abused its discretion by not awarding her attorney fees. Both Robin and Ryan request appellate attorney fees. Because we believe the concepts of continuity, stability, and approximation favor placing physical care with Robin, we modify the district court's award of physical care to award physical care to Robin. We also modify the district court's denial of trial attorney fees and the award of the tax exemption. We award Robin appellate attorney fees. Finally, we remand to the district court to fix child support and Ryan's visitation rights.

**I. Background Facts and Proceedings.**

We accept the following facts as recited by the district court in the dissolution decree, filed August 1, 2013.

> The parties were married [in March 2007] and separated on November 15, 2012.
> A temporary hearing was held on February 13, 2013 when the parties were granted joint custody. Physical care of the child was placed with Robin, and Ryan was ordered to pay child support of $747 per month beginning February 1, 2013. Ryan was granted and has exercised visitation every other Thursday through Monday morning and one night of visitation on the off week.
> Ryan will be 38 years of age this year and is in good health. Ryan is employed as a sales engineer/network design and maintenance worker earning a salary of $90,000 per year. Ryan did receive a bonus of $3,500 for his 2012 work, but none has been received in 2013. Ryan has been in his current employment since

May of 2012, and prior to that he had been employed with the same employer and doing similar tasks to what he is now for 16 years. Ryan works out of his home and travels periodically to jobsites that are typically within a 150 to 200 mile radius from Sioux City. Ryan's work schedule is flexible and no travel is an option. Ryan provides health insurance coverage for Robin, himself, their child, LEG, and each of their other children (2) at a cost of $266.50 per month. Single coverage is $5 per month

Robin will be 43 years of age this year and is in good health. Robin has had a weight loss procedure performed, but no complications were mentioned. Robin works as a substitute teacher in the Sergeant Bluff-Luton Community School District. The availability of work varies. Robin receives $100 per day or $50 for a half day of substitute teaching. Robin is seeking her master's degree in (1) curriculum and (2) guidance and counseling, which she hopes to receive in May of 2015. Robin has a college degree with majors in (1) human resource management and (2) business administration.

As a result of this marriage, one child was born; namely, LEG, born in 2006, and he just completed kindergarten in the Sergeant Bluff-Luton Community School District. LEG is in good health. LEG did participate in soccer.

Neither party asked the court to consider shared or joint physical care.

Ryan and Robin each have a child from a previous marriage. Ryan's son, GG, is 16 years of age and has resided with his father since he was [3] years of age. Ryan receives $203 per month in child support in Woodbury case CDCD118009 and is entitled to the tax exemption each year. The mother of GG testified to Ryan's parenting and their ability to communicate and co-parent. Robin's son, CM, will be 11 years old this year. Robin receives $624 per month in child support in Woodbury case CDCD119432 and is entitled to the tax exemption each year. CM's father is not in the area and is not actively involved. CM's paternal grandmother testified to Robin's parenting and their ability to communicate and arrange for visitation.

The parties own a home which they have agreed will be listed for sale and sold. Robin owed CM's father a judgment lien of $20,000, which he subordinated to enable Ryan and Robin to buy this residence. They have paid $5,000 per year and owe a balance of $5,000. Ryan also cashed in his 401(k) account from his prior employer in May 2012 and netted approximately $16,000 and used the funds for purchasing two computers, household furnishings, paying living expenses and marital debt. Ryan has struggled to pay the mortgage indebtedness and stay current on the other obligations ordered in the temporary order. Ryan was only able to make partial payments in March 2013 and the mortgage is currently

three months delinquent. Robin has not made any mortgage payments. Robin testified the equity should be split 70% Ryan and 30% to Robin.

. . . .

Robin is asking for Ryan to continue health insurance coverage on her until the end of 2015 or if she should obtain full-time employment, whichever occurs first. The court did not hear any evidence on Ryan's ability to continue coverage for Robin and her son, CM, after a decree of divorce is entered, nor were any COBRA costs presented. Robin is requesting $800 per month in alimony to offset her living expenses. Since fulltime employment is not possible while she is in school, Robin plans to continue as a substitute teacher until she is done with her master's degree and secures employment.

Both Ryan and Robin have been involved in other relationships while this matter is pending. Ryan acknowledges his relationship with Samantha Harkness is ongoing and it is his intent, when his lease expires, to move in with her and her two girls, ages 10 and 6. Samantha has had contact with LEG and gets along with him and Ryan's family well. Robin allowed an individual and his two children to move in with her and her two boys for a month or so.

Ryan believes he should be awarded physical care based upon his past 16 year success co-parenting [GG], his job, and his nearby family. Robin cites her stability and the past time spent as a stay-at-home mom. Both indicate the other is a good parent, but primarily cite communication difficulties with the other as the reason why they should be awarded physical care. Ryan offers as evidence his text communications and log of contact with Robin.

(Internal references to record and exhibits omitted.) We will expand upon the facts as is necessary to resolve the issues.

The district court awarded the parties joint legal custody of LEG and, noting neither parent requested shared physical care, awarded Ryan physical care of LEG. In doing so, the court expressed difficulty in making the determination because both Ryan and Robin are loving and caring parents. Although Ryan stipulated before trial and affirmed during testimony that the parties should receive the dependent tax exemption in alternate years, the court

awarded Ryan the exemption each year. The district court also denied Robin's request for attorney fees. Robin appeals.

**II. Standard of Review.**

We review equity proceedings de novo. *In re Marriage of Olson,* 705 N.W.2d 312, 313 (Iowa 2005). We give weight to the district court's findings, especially regarding the credibility of witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend on the facts of the particular case." *In re Marriage of White,* 537 N.W.2d 744, 746 (Iowa 1995).

Trial courts have considerable discretion in awarding attorney fees. *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994). The party seeking to overturn the court's decision must prove an abuse of discretion. *Id.*

**III. Discussion.**

**A. Physical Care.**

Robin maintains it is in LEG's best interest that she be awarded physical care. She argues she has historically been the child's primary caregiver and maintains several of the district court's findings of fact were not supported by the evidence.

"Our first and foremost consideration in determining custody is the best interest of the child involved." *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983); *see* Iowa Code § 598.41(3) (2011) (listing factors relevant to determining what custody arrangement is in the child's best interests). We use the factors enumerated in Iowa Code section 598.41(3) and *In re Marriage of Winter,* 223 N.W.2d 165, 166–67 (Iowa 1974), to determine which of the two

parents is most likely to provide an environment that brings the child to health, both physically and mentally, and to social maturity. *See In re Marriage of Hansen,* 733 N.W.2d 683, 695–96 (Iowa 2007). In making our determination, gender is irrelevant, and neither parent has a "greater burden than the other in attempting to gain custody." *In re Marriage of Bowen,* 219 N.W.2d 683, 689 (Iowa 1974).

We believe it is in LEG's best interest to award Robin physical care. Stability and continuity of caregiving are important considerations when deciding physical care. *See Hansen*, 733 N.W.2d at 696. "Stability and continuity factors tend to favor a spouse who, prior to divorce, was primarily responsible for physical care." *Id.* at 697–98. "The successful caregiving by one spouse in the past is a strong predictor that future care of the children will be of the same quality." *Id.* at 697.

Ryan and Robin both testified that at the parties' agreement, Robin quit her job to stay home and take care of LEG. She was the parent mainly responsible for caring for LEG, including baths, making meals, and taking him to appointments. Although Ryan was able to work out of the home and was present, he was often busy, as he worked fifty-five to sixty hours per week. Robin has continued to be the primary caregiver while she works part-time as a substitute teacher and pursues her master's degree in curriculum and guidance counseling. We acknowledge the district court had the opportunity to hear the witnesses and observe their demeanor, but we do not believe the district court gave Robin sufficient credit for being LEG's primary caregiver.

Robin has also provided more stability for LEG since the parties separated. When in Robin's care, LEG has been able to continue to sleep in the marital home and maintain his schedule. In contrast, while in Ryan's care, even school nights, LEG has stayed either at Ryan's apartment, the home of Ryan's new girlfriend, or the home of his paternal grandparents.

LEG's relationship with Robin's son, CM, also favors awarding Robin physical care. We recognize that awarding either parent physical care will separate LEG from one of his half-siblings. *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986) ("We have expressed a strong interest in keeping children of broken homes together. . . We believe these general principles should govern awards of physical care in cases of half siblings as well as others."). Both parties testified about the close relationship between LEG and CM. The two boys are within four years of age and share similar interests. Although LEG is also close with Ryan's son, GG, there is a greater difference in age between the two siblings, and GG is expected to leave home for college in about two years.

We also consider the parties' work schedules and their impact on the parties' abilities to care for LEG fulltime. At the dissolution trial, Ryan testified he had to travel overnight for work thirteen or fourteen times between the parties' separation in November 2012 and the hearing on May 29, 2013. There were other instances when he traveled approximately 200 miles for work, although he was able to make those day trips. If LEG became ill at school or had an emergency, Ryan would be unavailable on those travel days, and he would have

to rely on someone else for LEG's care.[1] In contrast, Robin's work as a substitute teacher does not require her to travel and allows her to keep the same schedule as LEG.

We believe the district court placed too much focus on several small incidents in making its physical care determination. In the dissolution decree, the court stated:

> The court in making this determination looked at Robin's refusal to allow Ryan to remove his oldest child's personal belongings and furniture from the marital home while this matter was pending. The court heard no logical explanation for this decision. Robin demanded a drug test, which Ryan took (without court involvement) and passed. When Robin determined Ryan was out of town, she demanded the child be returned to her, even traveling to Ryan's girlfriend's home where the child, girlfriend, and paternal grandparents were at. This necessitated a number of phone calls and was anxiety inducing. Robin signed LEG up for soccer and then expected Ryan to purchase the items needed for soccer, which he did, but then she did not take LEG to any of the soccer games. The soccer games that LEG made it to were during Ryan's time. Robin said she was at the soccer games of her other son, but Ryan testified he did not see her at the same soccer field nor did she offer any explanation on why she did not allow Ryan to take their son to these other soccer games. The court believes these factors tip the scale in Ryan's favor in determining LEG's long-term best interests will be served by being in his father's care.

After Ryan moved out of the marital home and filed for divorce, he re-entered the property several times without Robin's knowledge or consent to remove items. Only afterward, Robin refused to allow Ryan entry into the residence. Ryan filed a motion on April 3, 2013, requesting the court to authorize his entry into the home to retrieve possessions and for a realtor to inspect the premises. Apparently, the parties resolved the issue regarding Ryan retrieving

---

[1] At trial, Ryan testified his parents live in the area and have been able to help provide care for LEG in the past when Ryan had to travel for work.

his possessions as the court's order, filed April 23, 2013, only addressed and granted a date for Ryan and the realtor to enter the premises. At the trial on May 29, 2013, both parties confirmed Ryan had been allowed to enter the home following the court's order, and they had stipulated to which items were GG's so they could be returned to him.

Regarding the drug test, Robin testified she found rolling papers and synthetic potpourri, which she learned can be smoked like marijuana, in the marital residence. Following the discovery, she requested Ryan take a drug test. Ryan complied and the test results showed he was not using drugs. Robin agreed to pay for the test. The district court was not required to have any involvement in the incident, as Ryan took the test voluntarily and Robin agreed to pay for it.

We believe the district court placed too much focus on the incident involving Robin attempting to pick up LEG when Ryan was out of town. Robin mistakenly believed the temporary order gave her first right to have LEG in her care if Ryan was not available to care for him. Because of this belief, Robin went to Ryan's girlfriend's home to pick up LEG after learning Ryan was out of town. She left when she learned her understanding of the temporary order was wrong. At the hearing, Ryan claimed LEG was "terrified and confused and he didn't know why all the drama was going on." If LEG was terrified, as Ryan testified, his anxiety cannot be explained by Robin's actions as she only sat in her vehicle in the driveway and made no attempt to enter the home or take LEG.

Finally, the court considered Ryan's testimony that Robin signed LEG up for soccer, but failed to attend any of LEG's games. Robin asked Ryan to

contribute to the soccer registration fee but he did not respond. Two of LEG's games conflicted with the games of Robin's son, CM, and she acknowledged when such a conflict existed she did not attend LEG's games because she knew Ryan would be able to attend. She also experienced some difficulties in attending due to work responsibilities. Even assuming Ryan's claim is true, we do not believe it is enough to overcome or outweigh Robin's role as the historical primary caregiver of LEG.

At the dissolution hearing, both parties testified the other was a good parent, but cited difficulty communicating as a reason they should be awarded physical care of LEG. In support of his contention, Ryan presented a log of texts he had sent to Robin requesting to speak to LEG as well as her responses, which showed Robin only allowed him to talk to LEG eleven percent of the time he requested it. We agree Robin could have been more receptive to his requests, but Ryan sent an unreasonable number of text messages, and we believe Robin did allow a reasonable number of calls. Between December 3, 2012, and May 13, 2013, Ryan sent 157 text messages requesting to speak with LEG, notwithstanding some of the time Ryan provided LEG's care.[2] According to his own log, on at least one day over the course of less than three hours, Ryan sent ten text messages to Robin. Many of Robin's responses gave reasonable reasons for delaying LEG's return calls to Ryan such as: we have company; we

---

[2] The temporary order entered by the district court during the pendency of proceedings provided Ryan visitation with LEG:

> [E]very other Thursday from 4:00 p.m. until Monday morning when Ryan shall transport the child to school. If there is no school on the Monday that Ryan has visitation, Ryan shall have visitation until 6:00 p.m. that Monday evening. On the weeks that Ryan does not have the minor child for weekend visitation, Ryan shall have one night of visitation on Tuesday, Wednesday, or Thursday from 4:00 p.m. to 6:30 pm.

are going to eat dinner; he is in bed; and he is on a bike ride. There does not appear to be any dispute that Ryan was able to see or talk to LEG at least every other day.

As the district court recognized, both Robin and Ryan are good parents who want the best for LEG. However, we believe the concepts of continuity, stability, and approximation favor placing physical care with Robin. Thus, we modify the district court decision awarding Ryan physical care and instead award Robin physical care of LEG and remand for entry of an order fixing Ryan's visitation rights and his child support obligation. Iowa Code section 598.41(5)(b) requires the parent awarded physical care to support the other caregiver's relationship with the child. We expect Robin to comply with this obligation and foster LEG's relationship with his father through liberal visitation and mutual respect. We expect both parties to focus their attention on LEG's best interests and to co-parent him in their post-dissolution responsibilities.

**B. Right to Claim Dependent on Taxes.**

Robin also maintains the district court should have permitted each party to claim LEG as a dependent for tax exemption purposes in alternate years, rather than allowing Ryan to claim the exemption each year. She argues this was the correct award, as Ryan stipulated to the alternate exemption before trial and confirmed it again during his testimony.

The "general rule" is that the parent given physical care of the child is entitled to claim the child as a tax exemption. *See In re Marriage of Okland*, 699 N.W.2d 260, 269 (Iowa 2005); *see also* Iowa Ct. R. 9.6(5) ("The custodial parent shall be assigned one additional exemption for each mutual child of the

parents . . .").  "However, courts have the authority to award tax exemptions to the noncustodial parents to achieve an equitable resolution of the economic issues."  *Id.* (internal quotations omitted).  A claim by a noncustodial parent for the right to declare a child as a tax exemption may be appropriate when it would "free up more money for the dependent's care."  *Id.*

Here, we modify the district court's award of the tax exemption.  Ryan stipulated before trial and confirmed with his testimony at trial that the parties should alternate the tax exemption.  Robin agrees to alternate the exemption. Thus, we award Ryan the dependency exemption for 2013, with the parties alternating each year thereafter.

## C.  Trial Attorney Fees.

Robin requested the district court order Ryan to pay $10,000 of her attorney fees.  The district court denied the request.  Whether attorney fees should be awarded depends on the respective abilities of the parties to pay. *Guyer*, 522 N.W.2d at 822.  In addition, fees must be fair and reasonable.  *Id.*

Here, we modify the district court's denial of attorney fees and award Robin $5000.  At the time Ryan filed for divorce, he was earning approximately $90,000 annually while Robin was working as a part-time substitute teacher and attending school to complete her master's degree.  As the district court recognized in the dissolution decree, Ryan was in the position to assume more of the parties' debts, "Ryan will be shouldering much of the financial obligations from this relationship . . . [but] his affidavit of financial status filed prior to the temporary hearing and acknowledged is still accurate at the final hearing shows he has significant income exceeding his installment indebtedness."  Ryan has the

ability to contribute to Robin's attorney fees. The sum of $5000 shall be paid within ninety days of the issuance of the precedendo.

**D. Appellate Attorney Fees.**

On appeal, both Robin and Ryan request an award of appellate attorney fees. Appellate attorney fees are not a matter of right, but rather rest in the appellate court's discretion. *In re Marriage of Sullins*, 715 N.W.2d 242, 255 (Iowa 2006). We consider the needs of the party seeking an award, the ability of the other to pay, and the relative merits of the appeal. *Id.* Because Ryan earns substantially more income than Robin, and because Robin was successful on appeal, we award her $2500 in appellate attorney fees.

**IV. Conclusion.**

Because we believe the concepts of continuity, stability, and approximation favor placing physical care with Robin, we reverse the district court's award of physical care and award physical care of the minor child to Robin. We also modify the district court's decree to award Robin trial attorney fees and modify the award of the tax exemption. We award Robin appellate attorney fees. Finally, because the circumstances affecting child support and visitation may have changed since the decree was entered, we remand those issues to the district court for appropriate disposition in accordance with our opinion. Costs of appeal are assessed to Ryan.

**AFFIRMED AS MODIFIED AND REMANDED.**