**IN THE COURT OF APPEALS OF IOWA**

No. 24-1115
Filed April 23, 2025

**KEYVAN RUDD,**
        Plaintiff-Appellee,

**vs.**

**KARLEE SHAFFER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Mark R. Lawson, Judge.

        A mother appeals a district court ruling that modified physical care of her daughter. **AFFIRMED.**

        Ciara L. Vesey of Law Office of Ciara L. Vesey PLLC, Davenport, for appellant.

        Chase A. Cartee of Cartee Law, P.C., Davenport, and Paul A. Aitken of Aitken Law, PLLC, Davenport, for appellee.

        Considered without oral argument by Ahlers, P.J., and Badding and Buller, JJ. Telleen, S.J., takes no part.

**BADDING, Judge.**

Keyvan Rudd and Karlee Shaffer are the parents of A.L.R., born in 2019. When their daughter was one year old, Keyvan and Karlee agreed to a custody order placing her in their joint physical care. For the next three years, they successfully shared A.L.R.'s physical care. But in September 2023, Karlee moved to Georgia. The district court denied Karlee's request for physical care of A.L.R., instead modifying the custody order to place the child in Keyvan's physical care. Karlee appeals.

**I.      Background Facts and Proceedings**

Keyvan and Karlee's daughter, A.L.R., was born while they were both affiliated with an arena football team—the Quad City Steamwheelers. Keyvan played for the team, and Karlee was a cheerleader. Shortly after A.L.R. was born in 2019, Keyvan petitioned to establish custody under Iowa Code chapter 600B (2020). In a September 2020 stipulation, the parties agreed to joint legal custody and joint physical care of A.L.R. They were both living in Davenport at the time. Keyvan's position with the football team required weekday morning practices and weekend games during a March to July season. Karlee was employed as a stylist at a department store, primarily working weekends. Both parents relied on their families to help balance their busy schedules with their childcare obligations.

In 2021, the Steamwheelers paused their operations because of the COVID-19 pandemic, so Keyvan traveled to Texas to play for a different team. He spent about two-and-a-half months out of state. During this time, Karlee had A.L.R. in her care full-time, although both sides of their families continued to help with childcare. While he was playing out of state, Keyvan maintained his

apartment in Davenport and cared for A.L.R. during visits home. When he returned to Iowa at the end of the football season, the parties' normal care schedule resumed. Keyvan played for the Steamwheelers again the following season.

In September 2022, Keyvan moved to Atlanta for a temporary job with an athletic company. Primary care for A.L.R. once again fell to Karlee and other family members. Keyvan recalled Karlee being supportive of his job pursuit, even though it disrupted their agreed-upon schedule. Around the same time, Karlee was building her business as a cosmetologist, while also working as a bartender and taking online college courses. During his time in Atlanta, Keyvan maintained contact with A.L.R. through video calls and visits home. And he kept paying rent on his Davenport apartment.

In March 2023, Keyvan came back to Davenport for another season with the Steamwheelers. Anticipating Keyvan would return to Georgia after that, Karlee began to express an interest in moving to Atlanta herself. Her lease in Davenport was set to expire, and she thought living in the same state as Keyvan would make coparenting easier. The parties dispute whether and when they discussed a mutual relocation. But the record is clear that by July, Keyvan had informed Karlee that his former position was filled and that he would be staying in Iowa.

Karlee moved to Atlanta anyway. She later testified that it "was a place [she] loved too," and she was interested in finishing her bachelor's degree at a university there. Karlee informed Keyvan of her intention by text message in mid-July. She did not indicate whether she planned to take A.L.R. with her, although she noted "we can cross that bridge when we get to it." Over the next few months, the parties exchanged some messages about daycare options in Atlanta. Keyvan

offered suggestions, which Karlee took as a sign that he approved of Karlee relocating A.L.R. there. But Keyvan said that he merely wanted to ensure Karlee had daycare in place for future visits with A.L.R.

When Karlee moved in September 2023, the parties had not settled on a plan for their daughter's long-term physical care. So A.L.R. stayed in Davenport with Keyvan. For the first three months after her move, Karlee had regular calls with A.L.R. and returned to Iowa for short visits. At the beginning of December— just a few days after Karlee petitioned to modify the parties' custodial arrangement—Karlee was in Iowa for a visit. Once she had A.L.R. in her care, Karlee told Keyvan that she intended to bring A.L.R. back to Georgia for a month. Keyvan asked Karlee to bring A.L.R. to his mother's house before they left to say goodbye. When Karlee arrived there with A.L.R., Keyvan and his family refused to let her leave with the child. The police were called but did not intervene in the dispute. So Karlee returned to Georgia without A.L.R.

During her next trip to Iowa at the end of December, Karlee tried to exercise her holiday visitation with A.L.R., but Keyvan refused because he was concerned that she would take the child to Georgia. Keyvan relented on January 1, 2024, after Karlee agreed that she would drop A.L.R. off at her preschool the next day. Instead, Karlee drove back to Atlanta with their daughter, telling Keyvan that she was "making up lost visitation." Keyvan sought an emergency injunction. On January 18, the district court ordered Karlee to return A.L.R. to Iowa and entered a temporary schedule requiring the parties to alternate care of the child on a two-to-three-week basis until the modification trial in May.

At that trial, Karlee testified that she was living in a rental house in Atlanta with her girlfriend of fourteen months and a female roommate. Their home had a bedroom and separate play area for A.L.R. Both Karlee's girlfriend and their roommate were longtime friends from Iowa, and they often babysat A.L.R. during her visits to Atlanta. Karlee testified that she had secured a daycare placement for A.L.R. and planned to enroll her in pre-kindergarten classes through the same program. Keyvan was still living in the same apartment that he had leased since 2020. He testified that he maintained a "structured schedule" for A.L.R. during her weeks in Davenport with him. She was enrolled in daycare and had regular visits with Keyvan's mother and stepdad. Karlee's mother also cared for A.L.R. one to three times each week. According to Karlee's mother, who testified for Keyvan, this arrangement was at her own request—not Keyvan's.

The parties also testified about their jobs and finances. Karlee was working six days per week as an eyelash technician and bartender while pursuing a psychology degree through online classes. Her anticipated income for 2024 was around $32,000. Keyvan had recently started a job as a youth counselor and was operating a small apparel business on the side. His expected income was about $37,000. Keyvan was still playing football too, but he thought 2024 would be his last season.

Following the trial, the district court ruled that while both parents could "provide a nurturing physical care environment" for A.L.R., their geographic distance required that one parent be designated as her primary caregiver. Acknowledging that the issue was close, the court determined that

> Keyvan can best provide for the long-term best interests of ALR. He has demonstrated more maturity and stability for the child. His proposed environment in the Quad Cities includes grandparents on both sides. Placing physical care with Keyvan maintains the home and relationships that ALR has grown up with.

The court accordingly modified the custody order to place A.L.R. in Keyvan's physical care, with visitation for Karlee during summers, spring breaks, and alternating holidays. Karlee appeals.

## II. Standard of Review

Modification proceedings are equitable, and so appellate review is de novo. *Christy v. Lenz*, 878 N.W.2d 461, 464 (Iowa Ct. App. 2016). "We examine the entire record and decide anew the issues properly presented." *Thorpe v. Hostetler*, 949 N.W.2d 1, 5 (Iowa Ct. App. 2020) (cleaned up). The district court's factual findings are not binding, but they are entitled to weight, especially when they concern the credibility of witnesses. *Id.*

## III. Analysis

A parent seeking to modify a joint physical care arrangement is required to prove (1) a material and substantial change in circumstances and (2) superior caretaking ability. *See In re Marriage of Harris*, 877 N.W.2d 434, 441 (Iowa 2016); *see also In re Marriage of Lehman*, No. 21-0468, 2021 WL 5919046, at *3 (Iowa Ct. App. Dec. 15, 2019) (citing opinions requiring proof of "better" rather than "superior" care and stating "the terms are synonymous"). The parties agree that Karlee's move to Georgia was a substantial change of circumstances. But they disagree on who was the superior caretaker.

Establishing the ability to provide superior care is generally a heavy burden, although "it is less when the petitioning parent seeks to end joint physical care." *In*

*re Marriage of Johnson*, No. 21-0647, 2022 WL 244514, at *3 (Iowa Ct. App. Jan. 27, 2022); *see also Lehman*, 2021 WL 5919046, at *3 ("[N]either parent is at a disadvantage when asking to modify joint physical care to sole physical care."). In assessing Karlee's claim for physical care, we consider the non-exclusive factors set out in Iowa Code section 598.41(3) (2023) and our case law.[1] *See In re Marriage of Courtade*, 560 N.W.2d 36, 37 (Iowa Ct. App. 1996) ("The criteria for determining child custody are applied in modification proceedings."). The "overriding consideration is the best interests of the child." *McKee v. Dicus*, 785 N.W.2d 733, 736–37 (Iowa Ct. App. 2010). Our objective is to place the child "in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Hansen*, 733 N.W.2d at 695.

Like the district court, we find this to be a close case, with two equally capable and loving parents. Although they both withheld the child from the other after Karlee's move to Atlanta, we agree with the court that "these are relatively minor blemishes on a record of good communication." "[W]hen both parents are superior by all standards," the task of assigning primary care is a "monumental" challenge. *Thorpe*, 949 N.W.2d at 7. Faced with that unenviable dilemma, the district court looked to the most prominent difference between Karlee and Keyvan's caregiving environments: location. It found a placement with Keyvan would preserve the "home and relationships that A.L.R. has grown up with." The court

---

[1] These criteria "are the same regardless of whether the parties are dissolving their marriage or are unwed." *Yarolem v. Ledford*, 529 N.W.2d 297, 298 (Iowa Ct. App. 1994); *see also* Iowa Code § 600B.40(2). And they are equally relevant when physical care, rather than custody, is at issue. *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007).

observed that both sets of A.L.R.'s grandparents were "heavily involved in her life" and that maintaining her proximity to these relatives would better serve A.L.R.'s interests.

Karlee contends that the district court erred by assigning "dispositive" weight to A.L.R.'s extended-family relationships. She argues that the court's role was to determine which parent could provide "superior care, not whether the child should remain accessible to her [grandparents]." But contrary to Karlee's position, A.L.R.'s proximity to both sides of her family was not the court's sole consideration—it was just one of the limited features that distinguished a placement with Keyvan. And the case law is clear that "[c]ontinuing familial relationships with collateral relatives is an appropriate factor to consider in custodial disputes." *In re Marriage of Heitritter*, No. 04-2078, 2005 WL 2989946, at *3 (Iowa Ct. App. Nov. 9, 2005); *accord Thorpe*, 949 N.W.2d at 8; *In re Marriage of Burkle*, 525 N.W.2d 439, 442 (Iowa Ct. App. 1994).

Proximity to supportive family members is especially important in this case, as both parents relied on help from their families in caring for A.L.R. since she was born. The district court also noted its concern with Karlee's limited support system in Atlanta, questioning "what would happen if she broke up with her girlfriend and the roommate moved out." Karlee says this was unfair speculation. Her girlfriend and roommate appeared in Iowa for the modification hearing and testified to their readiness to help with babysitting. Even so, this court has acknowledged that, in some situations, "grandparents may be better childcare providers" and that their

availability to assist with childcare "may be a factor in assessing a custodial claim."[2] *Melchiori v. Kooi*, 644 N.W.2d 365, 369 (Iowa Ct. App. 2002); *see also In re Petition of Purscell*, 544 N.W.2d 466, 468–69 (Iowa Ct. App. 1995).

Karlee also asserts that the "evidence of past caretaking patterns" shows she is better fit to meet A.L.R.'s future needs. She primarily points to Keyvan's absences from A.L.R.'s life while working out-of-state. A parent's past caregiving "is a strong predictor [of] future care." *Hansen*, 733 N.W.2d at 697. As the district court noted, Keyvan prioritized his career over his coparenting obligations more than once, "leav[ing] A.L.R. in Karlee's care when it was convenient to do so." But his stints away from Iowa were not without attention to A.L.R.'s needs. Keyvan testified that he coordinated with Karlee and extended family members to create a temporary care schedule for A.L.R. while he was gone. He maintained contact with A.L.R. during these periods, cared for her during visits home, kept the lease on his Davenport apartment, and consistently returned to the parties' joint physical care arrangement.

In contrast, Karlee permanently left Iowa without a clear long-term plan for A.L.R.'s care. And, in the district court's view, she moved to Atlanta "for no apparent reason" other than she was "tired of living in the Quad Cities." Karlee challenges that finding. She argues that by moving to Atlanta, she was "furthering

---

[2] Karlee voiced concerns about her mother's involvement with A.L.R. at the modification trial, citing her mother's "uncontrolled temper" and smoking habits. But any allegation that Karlee's mother is an unsafe caregiver is undermined by Karlee's testimony that she depended on her mother during Keyvan's temporary absences. The court found that Keyvan's effort to foster a relationship between A.L.R. and her grandmother was a sign of his maturity, while Karlee's desire to isolate her mother reflected poorly on Karlee.

her post-secondary education" and "obtaining higher paid employment," which were goals that served her daughter. The record, however, does not show that A.L.R. has benefitted from Karlee's decision. At the time of the hearing, Karlee was working at jobs that were similar to those she held in Iowa, and her courses were online.

Karlee suggests the district court punished her for relocating to Atlanta without A.L.R. We do not read the court's decision as "a matter of reward or punishment." *In re Marriage of Bowen*, 219 N.W.2d 683, 687 (Iowa 1974) (abandoning inference that children are better served by placing custody with mothers instead of fathers). Instead, after considering both parents' evidence, the court reasonably concluded that continuing A.L.R.'s current situation tipped the scales toward placing her in Keyvan's physical care. *See In re Marriage of Eggeling*, No. 18-0234, 2019 WL 478818, at *3 (Iowa Ct. App. Feb. 6, 2019) (affirming a modification placing physical care with a father to maintain continuity in the children's established community and school after the mother moved out of state).

"In custody modification cases, stability is the trump card." *Thorpe*, 949 N.W.2d at 7 (citation omitted). Karlee is correct that "our case law places greater importance on the stability of the relationship between the child and the primary caregiver over the physical setting of the child." *In re Marriage of Williams*, 589 N.W.2d 759, 762 (Iowa Ct. App. 1998). Here, however, the parties have shared equally in the care of their daughter since she was born, with both absenting themselves at times. There is no winning outcome in this case. But stability and continuity favor A.L.R.'s placement with Keyvan in Davenport, where she will

remain in a familiar environment surrounded by multiple dedicated caregivers. *See Hansen*, 733 N.W.2d at 696 (explaining that "stability and continuity of caregiving are important factors that must be considered in custody and care decisions").

After giving "careful consideration to the district court's findings" in this close case, we reach the same conclusion on our de novo review of the record. *In re Marriage of Reed*, No. 09-0029, 2009 WL 4122884, at *6 (Iowa Ct. App. Nov. 25, 2009); *accord In re Marriage of Roberts*, 545 N.W.2d 340, 343 (Iowa Ct. App. 1996). Choosing Keyvan as A.L.R.'s physical caregiver "was reasonable under the circumstances and served [her] best interests." *Eggeling*, 2019 WL 478818, at *3; *see also Crawford v. Rosen*, No. 14-1466, 2015 WL 2393689, at *4 (Iowa Ct. App. May 20, 2015) (finding a mother's "unilateral decision to move to New Jersey alone does not justify uprooting the child from the community she has known her entire life and from her father and her extended family"). We accordingly affirm the district court's decision to modify the custodial order to place the child in Keyvan's physical care.

Karlee challenges the district court's failure to award her trial attorney fees, and she requests an award of attorney fees on appeal. Keyvan also requests an award of appellate attorney fees. Iowa Code section 598.36 gives the district court discretion to "award attorney fees to the prevailing party in an amount deemed reasonable by the court." We have similar discretion under that provision to award appellate attorney fees. *In re Marriage of Michael*, 839 N.W.2d 630, 639 (Iowa 2013) (discussing factors considered in making an award). After considering the

relevant factors, we affirm the district court's denial of Karlee's request for trial attorney fees and deny the parties' requests for appellate attorney fees.

**AFFIRMED.**